629 S.E.2d 624

**SOUTH CAROLINA STATE PORTS AUTHORITY, Petitioner,**

v.

**JASPER COUNTY, Respondent.**

No. 26132.

Supreme Court of South Carolina.

Heard Sept. 20, 2005.
Decided April 3, 2006.
Rehearing Denied May 25, 2006.

See also 355 S.C. 631, 586 S.E.2d 853

C. Mitchell Brown and Kevin A. Hall, both of Nelson Mullins Riley & Scarborough, L.L.P., of Columbia, for Petitioner.

A. Camden Lewis, Keith M. Babcock and Brady T. Thomas, all of Lewis, Babcock & Hawkins, of Columbia; and Marvin C. Jones, of Bogoslow Jones Stephens & Duffie, P.A., of Walterboro, for Respondent.

Justice BURNETT:

This case was filed in the original jurisdiction of the Court, pursuant to Rule 229(a), SCACR. The South Carolina State Ports Authority (SCSPA) seeks a declaratory judgment determining whether it has the exclusive authority to develop a port or terminal on the Savannah River. The SCSPA further seeks determination of whether it has a superior right over

Jasper County (County) to condemn land on the Savannah River for port or terminal development, and thus a superior right to port or terminal development. The SCSPA does not have the exclusive authority to develop a port or terminal on the Savannah River. Further, County has the power and authority, which is consistent with the Constitution and general law of this State, to develop a county-owned public marine terminal. However, we find the SCSPA's eminent domain power is superior to County's power.

## FACTUAL BACKGROUND

After several years of rejecting the idea of building a public marine terminal in County, the SCSPA informed County in early 2004 of its interest in 1,776 acres of land located along the Savannah River (Proposed Site) and that it intended to conduct studies and evaluations of the land as a necessary precursor to condemning the land for the purpose of a port.[1] In October 2004, Jasper County Council (Council) voted to establish its own ports authority as part of a plan to acquire the Proposed Site.

On January 7, 2005, Council adopted Resolution # 05–01, which authorized County to enter into development and management agreements with South Atlantic International Terminal, LLC (SAIT), a private company. Under Resolution # 05–01, County would own the land and the public marine terminal.[2] SAIT would assist County in developing and managing County's terminal, and SAIT would serve as Port Developer/Manager for County. On the same day, County had a first reading of County Ordinance # 05–02 which allowed County to enter into a loan agreement with SAIT for preliminary financing of a public marine terminal. Also on January 7, 2005, County offered to purchase the Proposed Site from the land-

---

1. County disputes this fact and asserts that the SCSPA did not contact or inform County of the SCSPA's intent to condemn the Proposed Site prior to this case.

2. The parties disagree over whether County has proposed to build a marine terminal or a port on the Savannah River. Whether County intends to develop a port or a marine terminal and the potential difference in the meaning of those terms is not determinative of the issues in this case.

owner, Georgia Department of Transportation (GDOT). County notified GDOT that it would commence condemnation proceedings if negotiations to purchase the land failed, and on January 19, 2005, County filed a Notice of Condemnation against GDOT.[3]

On January 18, 2005, the SCSPA's board of directors unanimously approved a resolution to undertake efforts to acquire the Proposed Site, including commencing a condemnation action. The board also approved the step of commencing this lawsuit. On the same day, the SCSPA requested permission, as required by S.C.Code Ann. § 28–2–70 (1991), from GDOT to enter the Proposed Site in anticipation of condemning the land. The SCSPA commenced this action in the Court's original jurisdiction on January 19, 2005, seeking declaratory judgments and injunctive relief.

## ISSUES

I. Does the SCSPA's Enabling Act preempt County from developing a county-owned public marine terminal on the Savannah River?

II. If County is not preempted, does County have the power and authority to create a county-owned public marine terminal?

III. If County has the power and authority to create a county-owned public marine terminal, is that power consistent with the Constitution or the general law of the State?

## LAW/ANALYSIS

■ Determining whether a local ordinance is valid is essentially a two-step process. *Bugsy's, Inc. v. City of Myrtle*

---

3. County previously attempted to condemn the same land for construction of a terminal. *Georgia Dept. of Transp. v. Jasper County*, 355 S.C. 631, 586 S.E.2d 853 (2003). We found that condemnation to be unlawful. We held that "County's proposed marine terminal does not meet our restrictive definition of public use. The private lessor, SAIT, will finance, design, develop, manage, and operate the marine terminal. The terminal itself will be a gated facility with no general right of public access." *Id.* at 639, 586 S.E.2d at 857. In holding the condemnation unlawful for lack of a public purpose, we noted that the lease arrangement in which County planned to lease the land to SAIT for ninety-nine years defeated the validity of the condemnation. *Id.*

*Beach,* 340 S.C. 87, 93, 530 S.E.2d 890, 893 (2000). The first step is to ascertain whether the county had the power to enact the ordinance. If the state has preempted a particular area of legislation, then the ordinance is invalid. If no such power existed, the ordinance is invalid and the inquiry ends. However, if the county had the power to enact the ordinance, then the Court ascertains whether the ordinance is inconsistent with the Constitution or general law of this state. *Id. See also Hospitality Ass'n of South Carolina, Inc. v. County of Charleston,* 320 S.C. 219, 224, 464 S.E.2d 113, 117 (1995).

## I. Preemption

The SCSPA argues the General Assembly has preempted the field of developing and constructing harbors and seaports, including terminals, on the Savannah River, through its Enabling Act, S.C.Code Ann. §§ 54–3–110 through –1050 (1992 & Supp.2004). We disagree.

■ To preempt an entire field, an act must make manifest a legislative intent that no other enactment may touch upon the subject in any way. *Town of Hilton Head Island v. Fine Liquors, Ltd.,* 302 S.C. 550, 552, 397 S.E.2d 662, 663 (1990).[4] We have not expressly followed the same preemption analysis in deciding whether a state law preempts a local law as we have applied in deciding whether a federal law preempts a state law or regulation. *Compare Fine Liquors, Ltd.,* 302 S.C. at 552–53, 397 S.E.2d at 663 *with State v. 192 Coin–Operated*

---

4. *See also Denene, Inc. v. City of Charleston,* 352 S.C. 208, 574 S.E.2d 196 (2002) (no preemption where ordinance affected the hours of operation of beer and wine retailers when Department of Revenue had authority to regulate operation of retailers of beer, ale, porter and/or wine); *Barnhill v. City of North Myrtle Beach,* 333 S.C. 482, 511 S.E.2d 361 (1999) (finding preemption of regulating watercraft on navigable waters where statute required local laws to be identical to statute); *Wrenn Bail Bond Service, Inc. v. City of Hanahan,* 335 S.C. 26, 28, 515 S.E.2d 521, 522 (1999) (finding preemption of the field of professional licensing for bail bondsmen through a statute providing, "[no] license may be issued to a professional bondsman or runner except as provided in this chapter"); *Hospitality Ass'n of South Carolina, Inc.,* 320 S.C. at 228 n. 9, 464 S.E.2d at 119 n. 9 (no preemption of field of local sales taxation because of absence of legislative intent); *AmVets Post 100 v. Richland County Council,* 280 S.C. 317, 313 S.E.2d 293 (1984) (no preemption of the regulation of bingo but rather that the statute contemplated further regulation by counties and municipalities).

*Video Game Machines,* 338 S.C. 176, 186, 525 S.E.2d 872, 877 (2000) (federal law may preempt a state law as follows: (1) Congress may explicitly define the extent to which it intends to preempt state law, (2) Congress may indicate an intent to occupy an entire field of regulation, or (3) federal law may preempt state law to the extent the state law actually conflicts with the federal law, such that compliance with both is impossible or the state law hinders the accomplishment of the federal law's purpose); *accord Michigan Canners Freezers Ass'n v. Agricultural Marketing Bargaining,* 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984). We find it appropriate to address the SCSPA's preemption arguments using the three categories previously recognized when discussing federal law preemption, any of which is a method by which the General Assembly's intent may be made manifest.[5]

The following provisions of the SCSPA's Enabling Act are at issue:

> Through the [SCSPA], the State may engage in promoting, developing, constructing, equipping, maintaining, and operating the harbors or seaports within the State. S.C.Code Ann. § 54–3–110.

> The [SCSPA] is created as an instrumentality of the State for the accomplishment of the following general purposes: ... (8) To promote, develop, construct, equip, maintain and operate a harbor or harbors within this State on the Savannah River, and in furtherance thereof have all of the powers, purposes and authority given by law to the [SCSPA] in reference to the harbors and seaports of Charleston, Georgetown and Port Royal [*see* § 54–3–410]; and (9) In general to do and perform any act or function which may tend to or be useful toward the development and improvement of such harbors and seaports of this State and to the increase of water-borne commerce, foreign and domestic, through such harbors and seaports. *Id.* § 54–3–130.

---

**5.** Other courts have recognized the three federal law preemption categories when considering whether a state law preempts a local law. *See Phantom of Clearwater, Inc. v. Pinellas County,* 894 So.2d 1011 (Fla. Dist.Ct.App.2005); *Goodell v. Humboldt County,* 575 N.W.2d 486 (Iowa 1998); *Worton Creek Marina, LLC v. Claggett,* 381 Md. 499, 850 A.2d 1169 (2004); *State ex rel. City of Alma v. Furnas County Farms,* 266 Neb. 558, 667 N.W.2d 512 (2003).

[F]or the acquiring of property necessary for the development of a harbor or harbors within this State on the Savannah River, the [SCSPA] may purchase them by negotiation or may condemn them. The power of eminent domain shall apply not only to all property of private persons or corporations but also as to property already devoted to public use. *Id.* § 54–3–150.

## A. Express Preemption

Express preemption occurs when the General Assembly declares in express terms its intention to preclude local action in a given area. *See e.g. Wrenn Bail Bond Service, Inc.*, 335 S.C. at 28, 515 S.E.2d at 522. *See also Michigan Canners Freezers Ass'n.*, 467 U.S. at 469, 104 S.Ct. 2518; 56 Am.Jur.2d *Municipal Corporations* § 392 (2000); 5 *McQuillin Municipal Corporations* § 15.18 (rev. 3d ed. 2004). The General Assembly has not expressly preempted the field of developing harbors, ports, and terminals on the Savannah River.

## B. Implied Field Preemption

Under implied preemption, an ordinance is preempted when the state statutory scheme so thoroughly and pervasively covers the subject so as to occupy the field or when the subject mandates statewide uniformity. *See Denene, Inc.*, 352 S.C. at 213, 574 S.E.2d at 199 ("[i]t would have been unnecessary for the legislature to refer to municipalities' authority to regulate the hours of operation of retail sales of beer and wine if the General Assembly intended to occupy the entire field"); *McAbee v. Southern Ry. Co.*, 166 S.C. 166, 166, 164 S.E. 444, 445 (1932) ("the question [of] whether a conflict exists [between a statute and an ordinance] depends upon whether the state has occupied the whole field of prohibitory legislation with respect to the subject. If such is the case it is held that a conflict exists."). *See also Michigan Canners Freezers Ass'n*, 467 U.S. at 469, 467 U.S. 461; 56 Am.Jur.2d *Municipal Corporations* §§ 329, 392; 5 *McQuillin Municipal Corporations* § 15.18.

The SCSPA contends that the specific provisions in S.C.Code Ann. §§ 54–3–130 and –150 manifest a legislative

intent to occupy the field. The SCSPA, relying on *Barnhill*, 333 S.C. at 486–87, 511 S.E.2d at 363–64, asserts that the statutory purpose of acquiring property and developing ports within the State on the Savannah River makes manifest a legislative intent that no other enactment may touch upon that subject. In *Barnhill*, the applicable statute provided that "the provisions of this chapter . . . shall govern the operating [sic], equipment, numbering and all other matters relating thereto whenever any vessel shall be operated *on the waters of this State* . . . ." *Id.* at 487 n. 2, 511 S.E.2d at 363 n. 2 (citing S.C.Code Ann. § 50–21–30) (emphasis in original). The SCSPA's reliance on *Barnhill* is misplaced. The applicable statute in that case manifested a clear legislative intent that state law—not local law—regulate watercraft on navigable waters. Unlike the statutory provisions in *Barnhill*, the SCSPA's Enabling Act does not manifest a clear legislative intent that state law control all aspects of port and terminal development.

 In construing statutory language, the statute must be read as a whole and sections which are a part of the same general statutory law must be construed together and each one given effect. *TNS Mills, Inc. v. South Carolina Dept. of Revenue*, 331 S.C. 611, 503 S.E.2d 471 (1998). A statute should not be construed by concentrating on an isolated phrase. *Laurens County School Districts 55 and 56 v. Cox*, 308 S.C. 171, 417 S.E.2d 560 (1992).

In construing S.C.Code Ann. §§ 54–3–110, –130 and –150 in their entirety, we discern no language prohibiting entities other than the SCSPA from developing a terminal on the Savannah River; nor is there a manifest intent that the SCSPA be the only developer of ports and terminals on the Savannah River. Section 54–3–150 enables the SCSPA to condemn property for port development but does not manifest an intent that other public entities are prohibited from condemning property for port or terminal development. The consistent use of the permissive "may" in describing the SCSPA's powers and the absence of language referring to other enactments touching upon the subject indicate that the General Assembly did not intend to occupy the field.

Several other factors demonstrate the General Assembly did not intend to occupy the field of port or terminal development. For example, S.C.Code Ann. § 54–3–410 gives the SCSPA the authority to supervise terminals in Charleston. Under § 54–3–130(8), the SCSPA has this same general supervision over any port or terminal on the Savannah River.[6] This general supervisory authority is a manifestation that the General Assembly contemplated the development of terminals by other entities.

Moreover, S.C.Code Ann. §§ 54–5–10 through –110 (1992) allows cities with a population in excess of 50,000 and which are located on a navigable stream to develop port and terminal utilities.[7] Also, municipalities, including counties, are authorized to construct terminals pursuant to S.C.Code Ann. §§ 6–21–5 through –570 (2004). These provisions further reveal the absence of a legislative intent to place exclusive authority to develop a port or terminal in the SCSPA.

The presence of non-SCSPA-owned terminals in the state further indicates the field is not occupied.[8] If the General

---

6. Section 54–3–410 provides:

 The [SCSPA] shall have general supervision on the port of Charleston of all wharves, warehouses and terminal facilities of all transmitting and transporting corporations and of all wharves, warehouses and terminal facilities of persons engaged in business of public warehousemen or wharfingers....

7. The SCSPA admits that S.C.Code Ann. § 54–5–10 provides a statutory exception but argues that we should apply the statutory construction maxim *expressio unius est exclusion alterius* or "to express one thing implies the exclusion of the other, or the alternative." *Riverwoods, LLC v. County of Charleston*, 349 S.C. 378, 563 S.E.2d 651 (2002). In our opinion, the maxim does not apply because it would revive Dillon's Rule, which has been overruled by Home Rule. *See Williams v. Town of Hilton Head Island*, 311 S.C. 417, 422, 429 S.E.2d 802, 805 (1993) (recognizing that Dillon's Rule had been abolished when Home Rule was enacted); *Hospitality Ass'n of South Carolina*, 320 S.C. at 225 n. 4, 464 S.E.2d at 117 n. 4 (prior to Home Rule, under S.C. Const., art. VIII, 17, courts strictly and narrowly construed any grant of local government power under Dillon's Rule).

8. Non–SCSPA owned terminals have existed since the SCSPA's creation. *See History of the South Carolina Ports Authority* 88, 101, 128, 134 (R.L. Bryan Co., 1991). Other private terminals in South Carolina include terminals owned by Nucor Steel, BP Amoco, MeadWestvaco, Chem–Marine, Shell, Exxon–Mobil, Allied, Salmon Dredging, Chevron–

Assembly had manifested an intent to preempt the field, then the SCSPA would be the *sole* developer of ports and terminals, and other entities, private and public alike, would be prohibited from such facilities.

The SCSPA argues that its grant of jurisdiction to oversee harbors within the state is a manifestation of a legislative intent to preempt the field. *See* S.C.Code Ann. § 54-3-120 ("The jurisdiction of the Authority in any of said harbors or seaports within the State shall extend over the waters and shores of such harbors or seaports. . . ."). This argument is unpersuasive because the statutory provision does not deal with port or terminal development within the State, but rather specifies the extent of the SCSPA's authority.

The SCSPA also argues that the field of port and terminal development is occupied because the management of South Carolina's ports requires statewide uniformity of purpose and application. In our opinion, the SCSPA's supervisory power set forth in S.C.Code Ann. § 54-3-410 indicates that uniformity is not required, but that the SCSPA has general supervisory powers over owners of terminals, including any terminal owned by County. In *Bugsy's, Inc.*, we noted that "while the General Assembly has enacted a comprehensive scheme regulating many aspects of video poker machines, the scheme does not manifest an intent to prohibit any other enactment from touching on video poker machines." 340 S.C. at 94, 530 S.E.2d at 893. Similarly, we find the SCSPA's Enabling Act to be a comprehensive scheme regulating many aspects of port and terminal development, ownership, and maintenance in this state, but the scheme does not evidence an intent to prohibit other entities, public or private, from developing a marine terminal on the Savannah River.

## C. Implied Conflict Preemption

█ Conflict preemption occurs when the ordinance hinders the accomplishment of the statute's purpose or when the ordinance conflicts with the statute such that compliance with both is impossible. *See Peoples Program for Endangered*

---

Texaco, Amerada Hess, Kinder Morgan, and the United States Navy. In the Port of Charleston, the SCSPA operates five public terminals and oversees, pursuant to S.C.Code Ann. § 54-3-410, nine other private terminals and seven bulk commodity terminals.

*Species v. Sexton,* 323 S.C. 526, 530, 476 S.E.2d 477, 480 (1996) ("To determine whether the ordinance has been preempted by Federal or State law, we must determine whether there is a conflict between the ordinance and the statutes and whether the ordinance creates any obstacle to the fulfillment of Federal or State objectives."); *192 Coin–Operated Video Game Machines,* 338 S.C. at 186, 525 S.E.2d at 877 (describing federal law conflict preemption); 56 Am.Jur.2d *Municipal Corporations* 392 ("[i]mplied conflict preemption occurs when an ordinance prohibits an act permitted by a statute, or permits an act prohibited by a statute"); 5 *McQuillin Municipal Corporations* § 15.18.

 The SCSPA contends that County's efforts to condemn the Proposed Site and develop a terminal on the site are in direct conflict with the specific provisions in the SCSPA's Enabling Act and serve to complicate and burden the SCSPA in accomplishing one of its express purposes. Specifically, the SCSPA argues that County's efforts conflict with S.C.Code Ann. §§ 54–3–130(8), –140(4),[9] and –150. In our opinion, the General Assembly has not preempted the field. The statutory provisions do not manifest an intent that other public entities are prohibited from developing ports and terminals or from exercising their eminent domain powers for such development. Compliance with both is possible and County's efforts do not conflict with the SCSPA's Enabling Act.[10]

## II. County's Power and Authority

 The SCSPA contends that County does not have the power and authority to develop and operate a terminal on the Savannah River. We disagree.

County's Resolution provides:

---

9. S.C.Code Ann. § 54–3–140 provides in pertinent part:

 In order to enable it to carry out the purposes of this chapter, the [SCSPA]: ... (4) May acquire, construct, maintain, equip and operate wharves, docks, ships, piers, quays, elevators, compresses, refrigeration storage plants, warehouses and other structures and any and all facilities needful for the convenient use of the same in the aid of commerce....

10. Further, if County develops a terminal on the Savannah River, this terminal would be under the SCSPA's general supervision pursuant to S.C.Code Ann. 54–3–130, –410.

[T]here is hereby established a public marine terminal for and of Jasper County on the Terminal Property to be named the South Atlantic International Terminal ... [T]here is hereby appointed ... South Atlantic International Terminal, LLC as Port Developer/Manager to provide assistance to the County in the form of turnkey development and management services....

County's Ordinance provides: "To adopt a Loan Agreement between the County and South Atlantic International Terminal, LLC and to authorize the borrowing of money as provided therein." The Resolution and Ordinance both find that:

a public marine terminal will serve the best interests of the citizens of Jasper County to (i) provide transportation facilities, (ii) remedy a shortage of marine cargo loading, unloading, and transshipment capacity in Jasper County, the State of South Carolina and the Lowcountry region, (iii) foster development of commerce in Jasper County, (iv) meet Jasper County's unrealized potential as a regional transportation nexus, and (v) reduce local unemployment.

Article VIII of the South Carolina Constitution "mandates 'home rule' for local governments" and requires "all laws concerning local government [to] be liberally construed in their favor." S.C. Const. art. VIII, § 17; *see also Quality Towing Inc. v. City of Myrtle Beach,* 340 S.C. 29, 37, 530 S.E.2d 369, 373 (2000). County contends that under S.C.Code Ann. § 4-9-25 (Supp.2004),[11] its Resolution, Ordinance, and proposed terminal are valid because the terminal will promote the general welfare of the county and enhance the county's economy. Section 4-9-25, especially when read in conjunction with Article VIII's mandatory liberal construction, authorizes County to pass a resolution and enact an ordinance promoting the general welfare of County's residents by building and

---

11. Section 4-9-25 provides:

All counties of the State ... have authority to enact regulations, resolutions, and ordinances, not inconsistent with the Constitution and general law of this State, including the exercise of these powers ... respecting any subject as appears to them necessary and proper for the security, general welfare, and convenience of counties....The powers of a county must be liberally construed in favor of the county and the specific mention of particular powers may not be construed as limiting in any manner the general powers of counties.

maintaining a public marine terminal on the Savannah River. *See Hospitality Ass'n of South Carolina,* 320 S.C. at 219, 464 S.E.2d at 113, (§ 5–7–30, analogous to § 4–9–25, authorized the Town of Hilton Head to enact an ordinance promoting the health, safety, and welfare of its residents by raising funds to improve, maintain, and nourish the Town's beaches).

## III. Validity of Ordinance

The SCSPA argues that County's Resolution and Ordinance are inconsistent with the Constitution and general law of this state. We disagree, but find the SCSPA's eminent domain power is superior to County's power.

Where an ordinance is not preempted by state law, the ordinance is valid if there is no conflict with State law. *Bugsy's Inc.,* 340 S.C. at 95, 530 S.E.2d at 894. A conflict between a state statute and a county ordinance exists when "both contain either express or implied conditions which are inconsistent with each other. . . . If either is silent where the other speaks, there can be no conflict between them. Where no conflict exists, both laws stand." *Fine Liquors,* 302 S.C. at 553, 397 S.E.2d at 664.

First, the SCSPA contends that County's Resolution and Ordinance conflict with Article VIII, § 14 of the South Carolina Constitution. Section 14 prohibits local governments from "set[ting] aside . . . the structure and the administration of any governmental service or function, responsibility for which rests with the State government or which requires statewide uniformity." County's Ordinance and Resolution do not "set aside" the structure or administration of developing ports or terminals because as previously explained, that function does not rest exclusively with the state government and does not require statewide uniformity. *Cf. Town of Hilton Head Island v. Coalition of Expressway Opponents,* 307 S.C. 449, 456, 415 S.E.2d 801, 805 (1992) (an ordinance is defective under Article VIII, 14 because it attempted to limit the authority granted to the Department of Highways by state law).

Second, the SCSPA argues that County's Resolution and Ordinance are inconsistent with the S.C.Code Ann. §§ 54–3–110 through –140. We conclude the statutory provisions and

the ordinance are consistent because the provisions are silent on the issue of whether public entities may develop a terminal on the Savannah River. We discern no conflict between these provisions and County's Resolution and Ordinance.

Third, the SCSPA argues that County's Resolution and Ordinance are inconsistent with the general law of the state because the SCSPA claims to have a superior eminent domain power with regard to developing a port or terminal and thus a superior development power. The SCSPA argues that § 54–3–150 gives it a "super" power of condemnation, so that even if County had the power to condemn the Proposed Site and develop a terminal, the SCSPA would have an overriding authority to condemn the previously condemned land and hence has a superior right to develop a port or terminal. We conclude the statutory provision and the ordinance are consistent because the provision is silent on the issue of whether the SCSPA can prevent other entities from port or terminal development.

Yet, we address the issue of priority of eminent domain rights between the SCSPA and County because there are ripening seeds of a controversy. *See Sunset Cay v. City of Folly Beach*, 357 S.C. 414, 593 S.E.2d 462 (2004). Eminent domain is an attribute of sovereignty. Because condemnation by a state agency is on behalf of the State, a state agency's power of eminent domain is superior to that of a political subdivision. *Riley v. S.C. Hwy. Dept.*, 238 S.C. 19, 118 S.E.2d 809 (1961). We conclude the SCSPA's right of condemnation regarding the Proposed Site is superior to County's condemnation right.

## CONCLUSION

We conclude County is not preempted from the field of port and terminal development on the Savannah River because the General Assembly has not manifested an intent that no other enactment touch upon the subject. Further, County has the power and authority to create a county-owned public marine terminal on the Savannah River, and this power is consistent with the Constitution and general law of the State. However, the SCSPA's right of condemnation is superior to County's right. Finally, we find it unnecessary to address the SCSPA's

request for injunctive relief. *See Whiteside v. Cherokee County School Dist. No. One,* 311 S.C. 335, 340, 428 S.E.2d 886, 889 (1993) (appellate court need not address remaining issues when resolution of prior issues is dispositive).

TOAL, C.J., MOORE, and WALLER, JJ., concur.

Acting Justice JOHN C. FEW concurring in part and dissenting in part in a separate opinion.

Acting Justice FEW concurring in part and dissenting in part:

I agree that Jasper County has the power to construct a marine shipping terminal on the Savannah River. I also agree that under normal circumstances this action would not conflict with State law, and therefore would not be preempted. Under the specific facts of this case, however, I believe that the County's ordinance is in conflict with the Ports Authority's enabling legislation in two important respects. First, the ordinance interferes with and hinders specific action being taken by the Ports Authority to acquire the Proposed Site. Second, it creates problems of interstate relations with the State of Georgia, the current owner of the Proposed Site. In these two ways, the County ordinance creates significant obstacles to the ability of the Ports Authority to fulfill the objectives set forth in the Ports Authority's enabling legislation, and it hinders the accomplishment of the purpose of that legislation. Therefore, the County ordinance is preempted. *See State v. 192 Coin–Operated Video Game Machines,* 338 S.C. 176, 186, 525 S.E.2d 872, 877 (2000). To this extent, I respectfully dissent. I would grant an injunction prohibiting the implementation of Jasper County's ordinance so long as the Ports Authority is actively pursuing efforts to condemn the Proposed Site and build a marine terminal there.

The County ordinance interferes with and hinders the Ports Authority's efforts to acquire the Proposed Site. The Ports Authority has unanimously adopted a resolution to undertake efforts to acquire, and if necessary condemn, the Proposed Site. Pursuant to that resolution, the Ports Authority has exercised its responsibility to have the property appraised as required in South Carolina Code § 28–2–70, and it has initi-

ated this lawsuit. Jasper County has also initiated efforts to condemn the Proposed Site, and has actually filed a condemnation action. When two governmental entities attempt to condemn the same property, there is an obvious conflict between those efforts. As the majority makes clear, the Ports Authority's condemnation power is superior to that of Jasper County. Therefore, the simple fact that Jasper County is trying to condemn the same property interferes with and hinders the efforts of the Ports Authority to acquire it.

In addition, there are specific ways in which Jasper County's condemnation efforts conflict with the efforts of the Ports Authority. For example, the Ports Authority has attempted to exercise its condemnation power by first initiating negotiations with the State of Georgia to purchase the Proposed Site. The Ports Authority has said it wants to file a condemnation action only if the negotiations fail. The existence of Jasper County's condemnation proceeding has very real potential to make these negotiation efforts impractical, if not impossible. In the face of this competing action by Jasper County, the Ports Authority will have to change its approach, and initiate its own condemnation action as a first resort, instead of as a last resort. Therefore, the County ordinance authorizing the Jasper County condemnation is interfering with the Ports Authority's ability to accomplish its goal in the manner it chooses. This interference is a significant obstacle to the fulfillment of the objectives of Ports Authority's enabling act.

The County's ordinance also poses potential problems of interstate relations because the ordinance seeks to condemn property owned by the State of Georgia. The issue regarding these problems is not whether there really is a potential problem. Rather, the issue is whether the Ports Authority, as the arm of State government with irrefutable authority to handle interstate relations regarding the harbor and lower end of the River,[12] reasonably believes there is a potential problem. It is not for this Court, and it is certainly not for Jasper County, to say that the Ports Authority is incorrect in its assessment as to what the issues and potential problems are in this State's relations with Georgia on the subject of a port on the Savannah River. Interstate relations are, at least in this

---

12. See footnote 3.

instance, an executive branch issue. In any instance, interstate relations should be handled on the State level; Counties should play no role in affecting relations between the States. The Ports Authority's determination that Jasper County's ordinance interferes with interstate relations regarding the Savannah River requires a finding that the ordinance is an obstacle to accomplishing the purposes and objectives of the Ports Authority's enabling act.

The first potential problem of interstate relations pointed out by the Ports Authority is that an ongoing dispute between two governmental entities in South Carolina as to which has the power to condemn the property puts both of them at a negotiating disadvantage with the State of Georgia.

Next, the Ports Authority points out that Jasper County has already failed in one effort to condemn this same property, and the record in this case reveals several potential problems with the current condemnation. In particular, the question arises from the record in this case as to whether the proposed condemnation is for public use, given the manner in which the County proposes to construct and operate the terminal. The existence of a competing condemnation proceeding with such significant potential defects has the potential to be a major distraction to the Ports Authority's efforts to acquire the property, and an advantage to the State of Georgia.

Even more importantly, the Ports Authority points out that the ongoing litigation between the County and Georgia is a significant obstacle to the efforts of South Carolina to negotiate a compact with the State of Georgia on all issues regarding the Savannah River, from its headwaters in the Northwestern corner of our State, to the coast, including, but certainly not limited to, the development and operation of a port. The Ports Authority has publicly stated that it wants to try to negotiate a resolution of these issues with Georgia, rather than to litigate them.

Finally, the existence of the Jasper County condemnation, and the danger of further litigation, give rise to the possibility that the State could be brought into a lawsuit in the federal courts of Georgia.

Turning to the applicable law, the federal courts, and this Court, have recognized three separate ways in which federal

law preempts state or local law. *Michigan Canners and Freezers Ass'n v. Agricultural Marketing & Bargaining*, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984); *State v. 192 Coin–Operated Video Game Machines*, 338 S.C. 176, 186, 525 S.E.2d 872, 877 (2000). The majority has adopted this approach to determining whether State law preempts local law. Under the third of these preemption categories, sometimes referred to as "implied conflict preemption," local law is preempted "when the [local] law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of [State law].' " *Michigan Canners & Freezers*, 467 U.S. at 469, 104 S.Ct. at 2523 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). As stated by this Court, under this third category, local law is preempted ". . . to the extent . . . the [local] law hinders the accomplishment of the [State] law's purpose." *192 Coin–Operated Video Game Machines*, 338 S.C. at 186, 525 S.E.2d at 877.

Two of the purposes of the Ports Authority's enabling act are to allow the Ports Authority to purchase or condemn land for the construction and operation of port and shipping facilities,[13] and to manage interstate relations with Georgia regarding a port on the Savannah River.[14] Jasper County's condemnation ordinance hinders the accomplishment of these purposes by interfering with the actions of the Ports Authority as described above. The ordinance is therefore preempted.

The next question is whether or not it is appropriate for this Court to use its injunctive power. I believe that it is.

---

13. South Carolina Code §§ 54–3–130(2); 54–3–140(2); and 54–3–150.

14. While the purpose to "manage interstate relations" is not explicitly stated in the enabling act, it is clearly implied. With regard to ports, the State acts through the Ports Authority. *See generally* South Carolina Code § 54–3–110. In some sections specifically, such as in section 54–3–130(8), and generally in others, the Ports Authority is given the responsibility of developing port facilities on the Savannah River. The introductory paragraph to section 54–3–130, which sets forth the "purposes," states that the specifically listed "purposes" are "intended to broaden and not to restrict any other powers. . . ." Therefore, if the State is going to develop port facilities on that River, the Ports Authority is the entity that must manage relations with Georgia, to the extent that is necessary.

The majority makes clear that the Ports Authority's condemnation power is superior to that of Jasper County. It should follow that the Ports Authority can exercise that power in the manner it chooses. Once a governmental entity decides to exercise its lawful authority to do anything, it is within the discretion of that governmental entity to decide how it wants to accomplish the task. The Ports Authority could choose to initiate its own condemnation action, and by doing so, stop the pending action by Jasper County. However, the Ports Authority has stated it does not choose to immediately initiate a condemnation proceeding, but rather prefers to exercise its condemnation power by first attempting to negotiate a solution with Georgia.

This course of action has numerous obvious advantages over immediate litigation, including the possibility of avoiding litigation altogether. In addition, it is consistent with sound public policy, and is contemplated by statutory provisions regarding condemnation. *See, e.g., South Carolina Code* § 28–2–70.

As explained above, however, the existence of the action by Jasper County interferes with the Ports Authority's ability to pursue its statutory authority to negotiate before filing a lawsuit. Therefore, I believe it is not enough merely to declare the superiority of the Ports Authority's condemnation authority. Going no farther than this would require the Ports Authority to take a course of action it does not deem to be advisable, immediate litigation, in order to exercise its condemnation power. Rather, the only way the Ports Authority can exercise the superior power the majority of this Court recognizes it has, in the manner the Ports Authority should be allowed to choose, is for this Court to stop Jasper County's condemnation action by issuing an injunction.