716 S.E.2d 280

**SANDLANDS C & D, LLC, and Express Disposal Service, LLC, Plaintiffs,**

v.

**COUNTY OF HORRY, a Political Subdivision of the State of South Carolina, acting by and through its duly elected County Council, and Horry County Solid Waste Authority, Inc., Defendants.**

No. 27042.

Supreme Court of South Carolina.

Heard May 24, 2011.

Decided Sept. 19, 2011.

452

454

---

Robert Joseph Sheheen, of Savage, Royall & Sheheen, of Camden, William Thomas Lavender Jr., and Joan Wash Hartley, both of Nexsen Pruet, of Columbia, for Plaintiffs.

Emma Ruth Brittain, of Thompson & Henry, of Myrtle Beach, Stanley Eugene Barnett, of Smith, Bundy, Bybee & Barnett, of Mt. Pleasant, and Victoria Thomas Vaught, of Battle, Vaught & Howe, of Conway, for Defendants.

Robert E. Lyon Jr. and M. Clifton Scott, both of Columbia, for Amicus Curiae South Carolina Association of Counties.

Karen Aldridge Crawford, of Nelson Mullins Riley & Scarborough, of Columbia, for Amici Curiae National Solid Wastes Management Association and Homebuilders Association of South Carolina.

## CERTIFIED QUESTION

Chief Justice TOAL.

Pursuant to Rule 244(a), SCACR,[1] we accepted the certified question from the Honorable Terry L. Wooten, United States District Court for the District of South Carolina, of whether the South Carolina Solid Waste Policy and Management Act, S.C.Code Ann. § 44–96–10 *et seq.* (2002) (SWPMA), preempts Horry County Ordinance 02–09 (2009), entitled "An Ordinance Regulating the County–Wide Collection and Disposal of Solid Waste Generated within Horry County and for the Prohibition of the Disposal of Solid Waste Materials in any Manner Except as Set Forth Herein; and Providing Penalties for Violation Thereof." We answer this question in the negative.

### FACTUAL/PROCEDURAL BACKGROUND

In 1976, Congress enacted the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.* (1976, as amended) (RCRA), to create a longterm solution for managing the increasing levels of solid waste across the United States and to address contiguous environmental problems created by harmful disposal methods, inadequate landfill capacity, and substandard facilities. *Id.* § 6901(a), (b). The RCRA also man-

---

1. Rule 244(a), SCACR, permits the Court to "answer questions of law certified to it by any federal court of the United States ... when requested by the certifying court if there are involved in any proceeding before that court questions of law of this state which may be determinative of the cause then pending in the certifying court when it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court."

dated the promulgation of corresponding guidelines by the Environmental Protection Agency. *See, e.g., id.* § 6907 (authorizing the promulgation of regulations governing solid waste management); *id.* § 6942(b) (authorizing the promulgation of regulations to oversee the creation of state solid waste management plans); 40 C.F.R. §§ 255.1 *et seq.* (regulations applicable to solid waste management); *id.* 256.01 *et seq.* (regulations applicable to state solid waste management plans).

In 1991, as a corollary to the federal guidelines, the General Assembly enacted the SWPMA after determining a "coordinated statewide management program [was] needed to protect public health and safety, protect and preserve the quality of the environment, and conserve and recycle natural resources." S.C.Code Ann. § 44–96–20(A)(13) (2002). Not only did the General Assembly seek to ensure the environmentally sound disposal of certain types of nonhazardous waste in South Carolina, but through the SWPMA, the General Assembly also sought to handle the practical problems associated with solid waste management by ensuring adequate landfill capacity to meet the state's future disposal needs and provide for the efficient and economical disposal of waste in the state. *See generally* S.C.Code Ann. § 44–96–20(A)(1)–(14) (listing the General Assembly's policy findings necessitating the passage of the SWPMA) *and* (B)(1)–(14) (listing the objectives of the SWPMA from a policy standpoint); 44–96–240(A)(1)–(6) (listing the General Assembly's findings necessitating the statewide management of solid waste) *and* (B)(1)–(2) (listing the objectives of the statewide management system). The SWPMA mandates the formation of a state solid waste management plan by DHEC and requires counties to prepare individual solid waste management plans or participate in regional solid waste management plans.[2] *Id.* §§ 44–96–

---

2. To summarize, the SWPMA requires a county or regional solid waste management plan to include, in relevant part: an estimate of the rate of solid waste disposal at facilities within the county or region at the effective date of the SWPMA and during the subsequent twenty-year period, an estimate of the existing capacity and remaining lifespan of the existing landfills in the county or region, an estimate of the number of facilities needed to dispose of waste generated within the county or region within the projected twenty-year period, the estimated cost of executing the proposed solid waste plan, the revenue needed to fund the

20(A)(14) (stating that a purpose of the SWPMA is to require the creation of solid waste management plans), –60 (requiring creation of a state solid waste management plan), –80(A) (requiring counties to participate in single county or regional solid waste management plans). The SWPMA charged DHEC with the task of promulgating regulations, which would create new standards governing non-hazardous waste disposal practices in the state. *Id.* § 44–96–260 (authorizing DHEC to enact regulations); S.C.Code Ann. Regs. § 61–107 *et seq.* (solid waste regulations). DHEC has since promulgated regulations which govern, *inter alia,* the "minimum standards for the site selection, design, operation, and closure of all solid waste landfills and structural fill areas." S.C.Code Ann. Regs. § 61–107.19.I.A.1. Furthermore, the SWPMA authorized DHEC to establish a statewide permitting scheme. S.C.Code Ann. § 44–96–260(2) (authorizing DHEC to permit solid waste facilities); *id.* § 44–96–290 (outlining permitting parameters). As part of the permitting process, the SWPMA provides that "[n]o permit to construct a new solid waste management facility or to expand an existing solid waste facility may be issued until a demonstration of need is approved by [DHEC]," S.C.Code Ann. § 44–96–290(E), and authorizes DHEC to promulgate regulations governing permitting and demonstration of need decisions. *Id.* § 44–96–290(D), (E); *see also* S.C.Code Ann. Regs. § 61–107.17 (Supp.2010) (DON Regulation). The DON Regulation creates geographic planning areas that DHEC must contemplate when deciding whether the projection of solid waste in the area warrants the construction of a new landfill at a proposed landfill site or the proposed expansion of an existing landfill. S.C.Code Ann. Regs. § 61–107.17.-B.10 (defining "planning area"); *id.* § 61–107.17.D.2 (criteria for determining need). However, planning areas also affect the determination of yearly allowable disposal rates at permitted solid waste facilities. S.C.Code Ann. Regs. §§ 61–107.17.-D.3.a–b. This calculation is partially based on the estimates contained in the county or regional solid waste management plans. The SWPMA also requires DHEC to render a consis-

waste management plan in the future and the monies available for that purpose, and the estimated cost of constructing new solid waste management facilities as they become necessary during the twenty-year period and revenues that can be made available to fund those projects. S.C.Code Ann. § 44–96–80(A)(1)–(7).

tency determination, of whether or not the proposed solid waste facility is consistent with state and county or regional solid waste management plans, local zoning and land-use ordinances and regulations, any other applicable local ordinances, and the buffer requirements contained in other DHEC regulations. S.C.Code Ann. § 44–96–290(F); S.C.Code Ann. Regs. § 61–107.17.B.5 (defining "consistency determination"); *id.* § 61–107.17.C.1 (providing that a permit will not be granted until the consistency determination is approved).

Plaintiffs Sandlands C & D, LLC (Sandlands) and Express Disposal Service, LLC (EDS) are related, privately-owned South Carolina companies. Sandlands owns and operates a landfill in Marion County, approximately two miles across the Horry County border, and EDS hauls waste originating in South Carolina and North Carolina to Sandlands' landfill.[3] DHEC granted Sandlands a permit to accept construction and demolition (C & D) waste[4] at the Marion County site. Prior to the passage of Horry County Ordinance 02–09 (the Ordinance), Sandlands received C & D waste originating in Horry County and hauled by EDS, accounting for a large portion of the waste processed at its landfill.

Horry County Council created Defendant Horry County Solid Waste Authority, Inc. (HCSWA) in 1990 to manage Horry County's solid waste needs. Horry County Code 60–90 (1990). The HCSWA, a non-profit corporation, owns and operates a municipal solid waste landfill[5] and a C & D landfill, permitted by DHEC, at the same site on Highway 90 in Horry County.

On April 7, 2009,[6] Horry County Council enacted the first ordinance in South Carolina regulating the flow[7] of solid waste

---

**3.** The close relationship between Sandlands and EDS is customary in the industry, ensuring reduced tipping fees for the hauler and a steady stream of waste flow and income for the solid waste facility.

**4.** DHEC classifies landfills that accept C & D waste as Class Two landfills. *See* S.C.Code Ann. Regs. § 61–107.19.IV (outlining requirements for this classification).

**5.** DHEC classifies landfills that accept municipal solid waste as Class Three landfills. *See* S.C.Code Ann. Regs. § 61–107.19.V (outlining requirements for this classification).

**6.** The Ordinance became effective on June 1, 2009.

to protect the health, safety and general well-being of the citizens of Horry County, enhance and maintain the quality of the environment, conserve natural resources and to prevent water and air pollution by providing for a comprehensive, rational and effective means of regulating the collection and disposal of solid waste generated in Horry County and for the prohibition of the disposal of any waste materials in any manner except as set forth in this Ordinance.

Horry County Code 02–09, Art. I, § 1.1. To this end, the Ordinance requires all acceptable solid waste [8] generated within Horry County to be deposited at the HCSWA's landfill or a "designated facility." *Id.* Art. II, § 2.1.1 (designation); *id.* Art. VIII, § 8.1.1 (restricting disposal to designated facilities). A "designated facility" is defined as "any solid waste facility(ies) owned and/or operated by the [HC]SWA and/or public owned facilities designated by the [HC]SWA for the acceptance or disposal of solid waste and [C & D] debris, including but not limited to, landfills and transfer stations." *Id.* Art. I, § 1.2.9. Any person or hauler violating the Ordinance by depositing waste at a non-designated facility is subject to penalties. *Id.* Art. VIII, § 8.1.4 (persons); *id.* Art. IX, § 9.1.2 (haulers); *id.* Art. XI, §§ 11.1–11.3 (penalties).

## QUESTION PRESENTED

Does the SWPMA preempt the Horry County Ordinance?

---

7. The concept of "flow control" refers to the requirement that waste generated and collected within a particular area be deposited at a specific location for disposal.

8. "Acceptable waste" includes C & D and municipal solid waste. *Id.* Art. I, § 1.2.1. The Ordinance excludes "unacceptable waste," which it defines as "sewage and its derivatives, agricultural waste, biomedical waste, special nuclear or by-product materials ... and hazardous waste." *Id.* Art. I, § 1.2.14. Under the Ordinance, "solid waste" is defined as "garbage, refuse, litter, rubbish or other waste resulting from industrial, commercial, agricultural or household activities not disposable by means of sewage system operated in accordance with state and federal regulations," *id.* Art. I, § 1.2.13, and "waste" is defined as "solid waste, C & D waste, biomedical waste, hazardous waste, agricultural waste and septic tank sludge, and includes both acceptable and unacceptable wastes," *id.* Art. I, § 1.2.15.

ANALYSIS

An ordinance "is a legislative enactment and is presumed to be constitutional." *Aakjer v. City of Myrtle Beach*, 388 S.C. 129, 133, 694 S.E.2d 213, 215 (2010) (*citing Southern Bell Tel. & Tel. Co. v. City of Spartanburg*, 285 S.C. 495, 497, 331 S.E.2d 333, 334 (1985)). The party challenging a local ordinance bears the burden of proving its invalidity. *Id.* It is mandated in "[t]his State's constitution . . . that the powers of local governments should be liberally construed." *Id.* (*citing* S.C. Const. art. VIII § 17).

We have employed a two-step analysis to determine the validity of a local ordinance. *S.C. State Ports Auth. v. Jasper County*, 368 S.C. 388, 394–95, 629 S.E.2d 624, 627 (2006) (*citing Bugsy's, Inc. v. City of Myrtle Beach*, 340 S.C. 87, 93, 530 S.E.2d 890, 893 (2000)). First, a court must determine "whether the county had the power to enact the ordinance." *Id.* at 395, 629 S.E.2d at 627. "If the state has preempted a particular area of legislation, then the ordinance is invalid," and "[i]f no such power existed, the ordinance is invalid and the inquiry ends." *Id.* Where a court finds the county did "ha[ve] the power to enact the ordinance," then it must "ascertain[ ] whether the ordinance is inconsistent with the Constitution or general law of this state." *Id.* (citations omitted).

## I. Authority to Enact the Ordinance

Despite Plaintiffs' extensive arguments concerning the question of whether Horry County had the authority to enact the Ordinance, the issue is not squarely before us, as the single question certified to this Court concerns preemption. However, for the sake of providing context to the preemption discussion, and because the two questions are inextricably linked in this case, we conclude Horry County validly enacted the Ordinance in furtherance of its police powers.

Recognizing that "[t]he management of solid waste is the inherent responsibility of local government, whose authority in this area is derived from its police powers," the Ordinance purports "to protect the health, safety, and general well-being of the citizens of Horry County, enhance and maintain the quality of the environment, conserve natural

resources and to prevent water and air pollution by providing for a comprehensive, rational and effective means of regulating the collection and disposal of waste...." Horry County Code 02–09, Art. I, § 1.1. We note that the mere mention of police power rhetoric as part of the preamble to an ordinance does not guarantee that a local governmental action is a valid exercise of such powers. *See, e.g., Henderson v. City of Greenwood,* 172 S.C. 16, 24, 172 S.E. 689, 691 (S.C.1934) ("The mere statement in the preamble of an ordinance that is passed under the police power does not give a municipality *carte blanche* to pass an unreasonable ordinance or one opposed to the Constitution or laws of the state.") (citations omitted). However, in view of the counties' longstanding involvement in the field of solid waste management, we find that the Ordinance represents a valid exercise of Horry County's police powers, as articulated in section 4–9–25 of the South Carolina Code.[9]

---

9. Trash collection and disposal historically has been a regular duty of local governments. In 1956, the General Assembly first statutorily authorized regulation of the field by the counties through the issuance of licenses and franchises for the collection and disposal of solid waste. *See* Act No. 809, 1956 S.C. Acts 1837 (*codified at* S.C.Code Ann. §§ 44–55–1010 to –1060 (Supp.2010)). In 1974, the General Assembly further authorized the counties to participate in collecting and disposing of solid waste through the employment of county employees or by contract with municipalities or private entities, to levy charges for any services provided, and to again promulgate any necessary regulations. *See* Act No. 886, 1974 S.C. Acts 1941 (*codified at* S.C.Code Ann. §§ 44–55–1210–1230 (Supp.2010)).

With the advent of "home rule" legislation in this state, the General Assembly in 1989 enacted section 4–9–25 of the South Carolina Code, which states:

All counties of the State, in addition to the powers conferred to their specific form of government [under section 4–9–30], have authority to enact regulations, resolutions, and ordinances, not inconsistent with the Constitution and general law of this State, including the exercise of these powers in relation to health and order in counties or respecting any subject as appears to them necessary and proper for the security, general welfare, and convenience of counties or for preserving health, peace, order, and good government in them. The powers of a county must be liberally construed in favor of the county and the specific mention of particular powers may not be construed as limiting in any manner the general powers of counties.

S.C.Code Ann. § 4–9–25 (Supp.2010). The broad delegation of power under this section "is limited only by the requirement that the regulation, resolution, or ordinance be consistent with the Constitution and

## II. Preemption

■ We now turn to the thrust of the certified question—whether the SWPMA preempts the Ordinance. As stated previously, an ordinance is invalid if we find that state law preempts the area of legislation. *Ports Auth.,* 368 S.C. at 395, 629 S.E.2d at 627. "To preempt an entire field, an act must make manifest a legislative intent that no other enactment may touch upon the subject in any way." *Id. (citing Town of Hilton Head Island v. Fine Liquors, Ltd.,* 302 S.C. 550, 552, 397 S.E.2d 662, 663 (1990)). In *South Carolina Ports Authority v. Jasper County,* we discussed federal preemption concepts and premised our finding of no preemption on the basis that the petitioner failed to establish express preemption, implied field preemption, and implied conflict preemption. 368 S.C. at 395–96, 629 S.E.2d at 627–28 (explaining that in federal court, preemption may be had on grounds of express preemption, implied field preemption, and implied conflict preemption). Likewise, we discuss these federal preemption categories here because Plaintiffs contend these same categories are substantiated in the present case.

### A. Express Preemption

Plaintiffs argue that the SWPMA expressly subordinates county regulation of solid waste management to DHEC, creates a coordinated statewide solid waste management system, and mandates regional planning. Therefore, the SWPMA and accompanying regulations expressly preempt a county from regulating the flow of solid waste within the counties, as required by the Ordinance.

■ "Express preemption occurs when the General Assembly declares in express terms its intention to preclude local action in a given area." *Ports Auth.,* 368 S.C. at 397, 629 S.E.2d at 628 (citations omitted).

At the outset, we recognize that the SWPMA imposes a coordinated, statewide regulatory scheme overseen at the state level by DHEC. *See, e.g.,* S.C.Code Ann. § 44–96–20(A)(13) ("A coordinated statewide solid waste management

general law of this State." *Hospitality Ass'n of S.C., Inc. v. County of Charleston,* 320 S.C. 219, 226, 464 S.E.2d 113, 118 (1995).

program is needed to protect public health and safety, protect and preserve the quality of the environment, and conserve and recycle natural resources."). However, we disagree with Plaintiffs concerning the purported scope of the counties' regulatory authority as part of this statewide scheme.

The SWPMA does not prohibit county regulation of solid waste management. Plaintiffs urge this Court to adopt a rule whereby DHEC has the exclusive authority to regulate the entire field of solid waste management, arguing this case is analogous to *Southeast Resource Recovery, Inc. v. South Carolina Department of Health and Environmental Control,* 358 S.C. 402, 595 S.E.2d 468 (2004). In that case, this Court held that DHEC possessed the exclusive authority under the SWPMA to make consistency determinations as part of the permitting process, and consequently, DHEC could not relinquish this decision to the counties. *Id.* at 408, 595 S.E.2d at 471. Although there is no doubt the express language of the SWPMA provides for DHEC's exclusive authority in the area of *permitting, see* S.C.Code Ann. § 44–96–290(E) ("No permit to construct a new solid waste management facility or to expand an existing solid waste management facility may be issued until a demonstration of need is approved by the department."); *id.* § 44–96–260(2) (DHEC may "issue, deny, revoke, or modify permits, registrations, or orders under such conditions as the department may prescribe . . . ."), we glean no similar express language in the statute concerning the *flow* of solid waste within the counties. Therefore, *Southeastern Resource Recovery* is inapposite.

Furthermore, Plaintiffs have not identified any specific provisions of the SWPMA that prohibit Horry County's passage of the Ordinance. To the contrary, the SWPMA is laden with references to the counties' involvement in the management and regulation of solid waste. *See, e.g.,* 44–96–80(A), (J), (K). Likewise, the DON Regulation itself contains no express language prohibiting county regulation of the flow of waste.[10] *But see* S.C.Code Ann. § 44–96–290(F) (Supp.2010) ("[N]o permit to construct a new solid waste management facility or

---

10. Because the DON Regulation contains no express language prohibiting the Ordinance, we discuss Plaintiffs' arguments concerning the operation of the DON Regulation in the context of implied conflict preemption, *infra.*

to expand an existing solid waste management facility within a county or municipality may be issued by the department unless the proposed facility or expansion is consistent with local zoning, land use, and *other applicable local ordinances, if any[.]")* (emphasis added); S.C.Code Ann. Regs. § 61–107.-B.5.c (requiring consistency determinations account for any local ordinances); *id.* § 61–107.C.1 (providing DHEC must approve the consistency determination prior to granting a permit). Accordingly, we do not find section 44–96–80(K) expressly prohibits Horry County from enacting the Ordinance.[11]

█ Next, Plaintiffs cite a multitude of provisions to support their contention that the Ordinance conflicts with the SWPMA's requirement that counties adopt a regional approach to solid waste management.[12] There is no doubt the

---

11. Section 44–96–80(K) provides:

The governing body of a county is authorized to enact such ordinances as may be necessary to carry out its responsibilities under this chapter; provided, however, that the governing body of a county may not enact an ordinance inconsistent with the state solid waste management plan, with any provision of this chapter, with any other applicable provision of state law, or with any regulation promulgated by the department providing for the protection of public health and safety or for protection of the environment.

S.C.Code Ann. § 44–96–80(K) (2002).

12. *See* S.C.Code Ann. § 44–96–20(B)(14) (stating that a goal of the SWPMA is to "encourage local governments to pursue a regional approach to solid waste management"); *id.* § 44–96–50(C) (similarly providing that "[i]t is the policy of this State to encourage a regional approach to solid waste management[]"); *id.* § 44–96–60(A)(12) (requiring the state solid waste management plan to outline "procedures for encouraging and ensuring cooperative efforts in solid waste management by the State, local governments, and private industry, including a description of the means by which the State may encourage local governments to pursue a regional approach to solid waste management"); *id.* § 44–96–240(6) (2002) ("A regional approach to the establishment of solid waste management facilities should be strongly encouraged in order to provide solid waste management services in the most efficient and cost-effective manner and to minimize any threat to human health and safety or to the environment."); *id.* § 44–96–260(10) (authorizing DHEC to "encourage counties and municipalities to pursue a regional approach to solid waste management within a common geographical area"); *id.* § 44–96–270 (providing that "[t]he department shall conduct a study and shall submit a report to the Governor and to the General Assembly not later than eighteen months after this chapter

SWPMA favors regionalism. *See* S.C.Code Ann. § 44–96–80(G) ("Counties are strongly encouraged to pursue a regional approach to solid waste management."). However, the SWPMA unequivocally tempers the operation of all of the provisions advocating for a regional approach with the proviso, found in section 44–96–80(G), that "[n]othing in this chapter . . . shall be construed to require a county to participate in a regional plan. . . ." *Id.* The only interpretation supported by the plain language of section 44–96–80(G), together with all other provisions on the subject, is that the legislature intended the SWPMA to *"strongly encourage"* participation in a regional plan, but not to *"require"* it. *Id.* (emphasis added). This interpretation effectuates the stated objectives of the SWPMA of imposing a statewide, coordinated solid waste management system and advancing a regional approach to solid waste management, yet simultaneously allows for regulation at the local level. The express language of the SWPMA and DHEC regulations support this interpretation. Therefore, because Plaintiffs have not cited any express language in the SWPMA demonstrating the legislature's intent to preclude local regulation of the flow of solid waste within the counties, there can be no express preemption.

## B. Implied Field Preemption

Plaintiffs advance a similar argument with respect to implied field preemption. Plaintiffs contend that the SWPMA establishes a comprehensive statutory scheme for the permitting and siting of landfills that grants DHEC exclusive regulatory authority and responsibility for overseeing the field of solid waste management, and therefore, the SWPMA impliedly preempts the Ordinance. We disagree.

■ Implied field preemption occurs "when the state statutory scheme so thoroughly and pervasively covers the subject so as to occupy the field or when the subject mandates statewide uniformity." *Ports Auth.*, 368 S.C. at 397, 629 S.E.2d at 628 (citations omitted).

---

is effective on ways to encourage counties and municipalities to pursue a regional approach to solid waste management, including incentives to encourage the siting, construction, and operation of regional solid waste management facilities").

Plaintiffs primarily point to section 44–96–80(E) to support their contention the SWPMA provides for a statewide coordinated system in the field of solid waste management that occupies the entire field, and as a result, Horry County's passage of the Ordinance hinders statewide planning and policy. Section 44–96–80(E) provides:

Each [county or regional] solid waste management plan submitted pursuant to this section shall be consistent with the state solid waste management plan, with the provisions of this chapter, with all other applicable provisions of state law, and with any regulation promulgated by the department for the protection of public health and safety or for protection of the environment.

S.C.Code Ann. § 44–96–290(E) (2002).

While this section requires counties to comply with state law, DHEC regulations, and the state solid waste management plan when submitting their own county plans, we do not agree that this section demonstrates the General Assembly's intent to grant DHEC exclusive regulatory authority over the entire field of solid waste management. Where the General Assembly specifically recognizes a local government's authority to enact local laws in the same field, the statutory scheme does not evidence legislative intent to occupy the entire field of regulation. *See Denene, Inc. v. City of Charleston,* 352 S.C. 208, 213, 574 S.E.2d 196, 199 (2002) (stating "[i]t would have been unnecessary for the legislature to refer to municipalities' authority to regulate the hours of operation of retail sales of beer and wine if the General Assembly intended to occupy the entire field."); *AmVets Post 100 v. Richland County Council,* 280 S.C. 317, 313 S.E.2d 293 (1984) (where the language of the statute contemplated additional regulation of the game of bingo at the local level, there was not preemption). The SWPMA is silent with respect to control over the flow of local waste generated in the counties and, instead, expressly invites county regulation, planning, authority, and responsibility in the field of solid waste management. *See, e.g.,* S.C.Code Ann. § 44–96–80(A), (J), (K). Therefore, we find the legislature did not intend for DHEC to occupy the entire field of solid waste management.

Likewise, we find that the field of solid waste management does not require statewide uniformity. While the SWPMA implements a statewide regulatory framework overseen by DHEC, it still provides for flexibility so that the counties can address their individualized solid waste needs. The concerns about compliance with local regulations and the passage of conflicting local ordinances that were present in *Aakjer v. City of Myrtle Beach* are not present in this case. *See Aakjer*, 388 S.C. at 134, 694 S.E.2d at 215 (finding statewide uniformity was necessary after Myrtle Beach enacted a municipal ordinance requiring all motorcycle riders to wear helmets and eyewear within city limits (where such requirements were not mandated by state law) because inconsistent and conflicting local regulations would burden individuals seeking to conform to these requirements when riding their motorcycles across the state). To the contrary, in the solid waste field, statewide uniformity is not necessarily beneficial, given the various solid waste needs specific to each county, which differ in size, geography, and population.

Accordingly, we find Plaintiffs have not satisfied their burden with respect to implied field preemption.

### C. Implied Conflict Preemption

Plaintiffs contend that the Ordinance clearly hinders the purpose of the SWPMA because it obstructs the SWPMA's policy of mandating a regional approach to solid waste management and interferes with the DON Regulation's planning formula for adequate landfill capacity in the state. We disagree.

"[Implied] [c]onflict preemption occurs when the ordinance hinders the accomplishment of the statute's purpose or when the ordinance conflicts with the statute such that compliance with both is impossible." *Ports Auth.*, 368 S.C. at 400, 629 S.E.2d at 630 (citations omitted). Generally, additional regulation that merely supplements state law does not result in a conflict. *Denene*, 352 S.C. at 214, 574 S.E.2d at 199 (citations omitted).

In order for there to be a conflict between a state statute and a municipal ordinance "both must contain either express or implied conditions which are inconsistent or irreconcilable

with each other. Mere differences in detail do not render them conflicting. If either is silent where the other speaks, there can be no conflict between them. Where no conflict exists, both laws stand."

*Id.* (*quoting Town of Hilton Head,* 302 S.C. at 553, 397 S.E.2d at 664).

The General Assembly enacted the SWPMA, in relevant part, to:

(1) protect the public health and safety, protect and preserve the environment of this State, and recover resources which have the potential for further usefulness by providing for, in the most environmentally safe, economically feasible and cost-effective manner, the storage, collection, transport, separation, treatment, processing, recycling, and disposal of solid waste;

(2) establish and maintain a cooperative state program for providing planning assistance, technical assistance, and financial assistance to local governments for solid waste management;

(3) require local governments to adequately plan for and provide efficient, environmentally acceptable solid waste management services and programs;

(4) promote the establishment of resource recovery systems that preserve and enhance the quality of air, water, and land resources;

(5) ensure that solid waste is transported, stored, treated, processed, and disposed of in a manner adequate to protect human health, safety, and welfare and the environment;

. . . .

(7) encourage local governments to utilize all means reasonably available to promote efficient and proper methods of managing solid waste, which may include contracting with private entities to provide management services or operate management facilities on behalf of the local government, when it is cost effective to do so;

. . . .

(13) require local governments and state agencies to determine the full cost of providing storage, collection, transport,

separation, treatment, recycling, and disposal of solid waste in an environmentally safe manner; and

(14) encourage local governments to pursue a regional approach to solid waste management,

S.C.Code Ann. § 44–96–20(B)(1)–(5), (7), (13), (14), and to:

(1) regulate solid waste management facilities other than hazardous waste management facilities . . . ; and

(2) ensure that all solid waste management facilities in this State are sited, designed, constructed, operated, and closed in a manner that protects human health and safety and the environment,

*id.* § 44–96–240(B)(1)–(2). The Ordinance does not conflict with any of these enumerated purposes, either directly or impliedly.

Plaintiffs primarily argue that the Ordinance conflicts with statewide planning by inhibiting the implementation of the DON Regulation, which Plaintiffs argue mandates a regional approach to solid waste management in the State. As evidence of the conflict between the Ordinance and the General Assembly's intent to advance a regional approach to solid waste management, Plaintiffs point to the 75–mile wide planning radius for Class Three Landfills (which includes municipal solid waste facilities), and the increase in the planning area for Class Two Landfills (which includes C & D landfills) from the previously authorized 10–mile radius to a 20–mile planning radius.[13] *See* S.C.Code Ann. § 61–107.17.C.3 (listing the planning areas for the landfill classes). Specifically, Plaintiffs claim that because these planning areas extend beyond county

---

**13.** In 2009, DHEC promulgated the current DON Regulation, which made various changes to the previous DON Regulation, namely modifying the size of planning areas, augmenting the criteria for gaging the disposal rate cap for certain classes of landfills, and resolving when rate increases could be requested. *See* S.C.Code Ann. Regs. § 61–107.19.-A.1 (Supp.2010) (preamble). These changes were meant to "reduce the number of potential locations for new solid waste facilities and help to reduce and install a cap on the over-all allowable disposal rate in the State while ensuring an adequate number of facilities throughout the State to meet disposal needs." *Id.; see also* S.C.Code Ann. Regs. § 61–107.17 (Supp.2008) (2000 DON Regulation); *id.* § 61–100 (DHEC's prior mechanism for determining need, deemed unconstitutional in *Northeast Sanitary Landfill, Inc. v. South Carolina Department of Health and Environmental Control,* 843 F.Supp. 100 (D.S.C.1992)).

borders across the state, especially in the case of the municipal solid waste facilities, the Ordinance conflicts with the legislature's intent to require regional planning. For example, Plaintiffs argue, some counties are prohibited from hosting municipal solid waste facilities due to the restrictions of the DON Regulation. Plaintiffs also contend that the increase in size of planning areas for Class Two landfills further demonstrates the legislature's intent to promote regional planning in the field of solid waste management.

 We reiterate that the SWPMA merely *encourages* a regional approach to solid waste management while at the same time explicitly allowing single-county planning. *See* S.C.Code Ann. § 44–96–80(G). Therefore, we disagree with Plaintiffs to the extent they argue that the requirements of the DON Regulation mandate regionalism and foreclose county regulation of the flow of solid waste. There is no correlation between demonstration of need decisions and the ultimate destination of collected waste within a planning area. The planning radius merely serves to pinpoint the permissible location of a new facility. S.C.Code Ann. Regs. § 61–107.17.-D.2.a (requiring that no more than two landfills overlap in their respective planning areas). On the other hand, the rate of waste generated within a particular planning area is used to calculate the maximum allowable waste that may be disposed of at a particular facility per year, subject to increases as allowed under the DON Regulation. *Id.* § 61–107.17.D.3.a–b (calculating facilities' maximum capacity); *id.* 61–107.17.D.3.c–d (outlining how to obtain increases). This number is based in part on the overall disposal rates within a particular county or region, as compiled in the various county or regional solid waste management plans. However, there is no nexus between the location where collected waste is deposited and these calculations. We note further that the SWPMA allows (and encourages) counties not able to host a certain type of landfill to join with other counties to form regional solid waste plans. Moreover, solid waste facilities do not receive waste exclusively from their own planning areas, so even when facilities cannot host a certain type of landfill, that waste may still be transported to landfills across the state.[14] In our view,

---

14. Both Sandlands and the HCSWA accept waste from outside their planning areas.

the DON Regulation serves as a planning tool to ensure the state is prepared to meet the waste disposal needs of the population by providing adequate landfill capacity and to assist the counties in that endeavor. *See* 44–96–20(B)(2) (stating the purpose of the SWPMA is to "establish and maintain a cooperative state program for providing planning assistance, technical assistance, and financial assistance to local governments for solid waste management"). Accordingly, the Ordinance does not inhibit the operation of the DON regulation or encroach on DHEC's permitting authority.

While the SWPMA provides for a statewide management system, it also places the onus on the counties to plan and provide for solid waste collection and disposal at the local level. Horry County's passage of an ordinance regulating the flow of waste neither frustrates the purpose of the SWPMA, nor interferes with need determination for landfill permitting pursuant to the DON Regulation. Compliance with both the Ordinance and the SWPMA is undoubtedly possible. Therefore, we find that the Ordinance is not preempted under the implied conflict analysis.

## III. Inconsistency with the Constitution or General Law

Finally, we turn to whether the Ordinance is "inconsistent with the Constitution or general law of this state." *Ports Auth.*, 368 S.C. at 394–95, 629 S.E.2d at 627 (*citing Hospitality Ass'n*, 320 S.C. at 224, 464 S.E.2d at 117). Plaintiffs contend that the Ordinance directly conflicts with section 44–55–1020 of the South Carolina Code because that section allows individual generators of waste and municipalities to dispose of waste in any manner allowed by the county health departments, and the Ordinance requires disposal of solid waste at a facility designated by Horry County Council.

Plaintiffs' reliance on this section is specious. The Ordinance was not enacted with section 44–55–1020 in mind,[15] and

---

**15.** Horry County Council enacted the Ordinance pursuant to section 44–55–1210 of the South Carolina Code, *see* Horry County Code 02–09, Art. II, which provides:

The governing body of any county may by ordinance or resolution provide that the county shall engage in the collection and disposal of solid waste. Such collection and disposal may be accomplished either by use of county employees and equipment or by contract with

472

because the Ordinance does not pertain to Horry County's authority to issue licenses and franchises for the collection and disposal of waste under sections 44–55–1010 to –60, section 44–55–1020 has no bearing on the question of the Ordinance's validity in this case.[16]

Having determined that the Ordinance does not conflict with the SWPMA or DHEC regulations, which allow for county regulation of solid waste, we find the Ordinance is not inconsistent with section 44–55–1020. Plaintiffs have not directed us to any other inconsistent statutory or constitutional provisions. Therefore, the Ordinance is a valid exercise of Horry County's authority.

## CONCLUSION

Based on the foregoing, we find that the Solid Waste Policy and Management Act does not preempt Horry County Ordinance 02–09.

PLEICONES, BEATTY, KITTREDGE and HEARN, JJ., concur.

---

private agencies or municipalities of the county. Service charges may be levied against persons for whom collection services are provided whether such services are performed by the county, a municipality or a private agency.
S.C.Code Ann. § 44–55–1210 (Supp.2010). The Ordinance is obviously not prohibited by the plain language of this section.

16. We also note that the individual county health departments have since fallen under the regulatory authority of DHEC. Since DHEC began regulating solid waste management pursuant to the SWPMA, the agency has limited the operation of section 44–55–1020 through, for example, prohibiting individuals or municipalities to engage in "open dumping," defined as "any unpermitted or unregistered solid waste disposal or land filling activity," S.C.Code Ann. Regs. §§ 61–107.I.A.8 and 61–107.I.B.53, and requiring collectors of municipal solid waste to "ultimately dispose of solid waste at facilities and/or sites permitted or registered by [DHEC] for processing or disposal of that waste stream," S.C.Code Ann. Regs. § 61–107.5.D.3. To be clear, the SWPMA did not invalidate section 44–55–1020. However, we agree with Defendants that reliance on these antiquated statutes to invalidate the Ordinance is unavailing in light of the passage of the SWPMA and resulting regulations.