## THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Planned Parenthood South Atlantic, on behalf of itself, its patients, and its physicians and staff; Katherine Farris, on behalf of herself and her patients; Taylor Shelton, Appellants,

v.

State of South Carolina; Alan Wilson, in his official capacity as Attorney General of South Carolina; Edward Simmer, in his official capacity as Director of the South Carolina Department of Public Health; Anne G. Cook, in her official capacity as President of the South Carolina Board of Medical Examiners; Stephen I. Schabel, in his official capacity as Vice President of the South Carolina Board of Medical Examiners; George S. Dilts, Dion Franga, Richard Howell, Robert Kosciusko, Theresa Mills-Floyd, Jennifer R. Root, and Christopher C. Wright, each in their official capacity as a Member of the South Carolina Board of Medical Examiners; Samuel H. McNutt, in his official capacity as Chairman of the South Carolina Board of Nursing; Sallie Beth Todd, in her official capacity as Vice Chair of the South Carolina Board of Nursing; Tamara Day, in her official capacity as Secretary of the South Carolina Board of Nursing; Kellie Garber, Lindsey K. Mitcham, Rebecca Morrison, Kay Swisher, and Robert J. Wolff, each in their official capacity as a Member of the South Carolina Board of Nursing; Scarlett A. Wilson, in her official capacity as Solicitor for South Carolina's Ninth Judicial Circuit; and Byron E. Gibson, in his official capacity as Solicitor for South Carolina's Fifth Judicial Circuit, Respondents,

Henry McMaster, in his official capacity as Governor of the State of South Carolina, Intervenor-Defendant.

Appellate Case No. 2024-000997

Appeal from Richland County
Daniel Coble, Circuit Court Judge

Opinion No. 28280
Heard February 12, 2025 – Filed May 14, 2025

**AFFIRMED**

Catherine Peyton Humphreville and Kyla Eastling, of New York, NY; Kathleen McColl McDaniel, M. Malissa Burnette, and Grant Burnette LeFever, of Burnette Shutt & McDaniel, PA, of Columbia, all for Appellants.

Attorney General Alan McCrory Wilson, of Columbia, for Respondent State of South Carolina; Solicitor General Robert D. Cook, Deputy Solicitor General J. Emory Smith Jr., Assistant Deputy Solicitor General Thomas Tyler Hydrick, and Assistant Deputy Solicitor General Joseph David Spate, all of Columbia, for Respondents State of South Carolina and Attorney General Alan McCrory Wilson; William Donald Britt Jr., Jenny Rebecca Pittman, and Ashley Caroline Biggers, all of S.C. Department of Public Health, of Columbia, for Respondent Edward Simmer; Erin G. Baldwin and Robert E. Horner, both of Columbia, for Respondents Anne G. Cook, Stephen I. Schabel, George S. Dilts, Dion Franga, Richard Howell, Robert Kosciusko, Theresa Mills-Floyd, Jennifer R. Root, Christopher C. Wright, Samuel H. McNutt, Sallie Beth Todd, Tamara Day, Kelli Garber, Lindsey K. Mitcham, Rebecca Morrison, Kay Swisher, and Robert J. Wolff; Robert David Garfield and Steven R. Spreeuwers, of Garfield Spreeuwers Law Group, of Columbia, for Respondent Byron E. Gipson.

Chief Legal Counsel Thomas Ashley Limehouse Jr., Senior Litigation Counsel William Grayson Lambert, Deputy Legal Counsel Erica Wells Shedd, Deputy Legal Counsel Tyra S. McBride, all of the Office of the Governor, of Columbia, for Intervenor-Defendant Henry D. McMaster as Governor of the State of South Carolina.

David Allen Chaney, Jr., of Columbia, and Bridget E. Lavender, of New York, NY, both as Amicus Curiae for American Civil Liberties Union. Harmon L. Cooper, of Washington, DC, Amicus Curiae for Women's Rights and Empowerment Network.

---

**JUSTICE FEW:** We begin our discussion of this third round of abortion litigation with a statement then-Associate Justice Kittredge made opening the Court's opinion in the second round—*Planned Parenthood II*:

> We recognize the tendency of many to view the divisive issue of abortion through a lens shaped by their own politics or personal preferences. To be clear, our decision today is in no way intended to denigrate or exalt any of the valid concerns on either side of the abortion debate, whether those concerns are based in privacy, morality, medicine, religion, bodily autonomy, or something else. Rather, respectful of separation of powers principles and the limited (non-policy) role of the Court, we approach our solemn duty in this case with a single commitment: to honor the rule of law.

*Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 472, 892 S.E.2d 121, 125-26 (2023).

The particular "rule of law" we commit to in this case is the principle of statutory construction that a court's singular task in interpreting a statute is to identify and give effect to the intent of the legislature. *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000). With only that task in mind, we address the narrow question this case presents: at what point in a woman's pregnancy does a "fetal heartbeat" occur, as that term is defined in the 2023 South Carolina Fetal Heartbeat and Protection from Abortion Act? *See* Act No. 70, 2023 S.C. Acts 383, 385 (definition codified

at S.C. Code Ann. § 44-41-610(6) (Supp. 2024)).  The significance of our answer to the question derives from the prohibition in the 2023 Act—subject to limited exceptions—that "no person shall perform or induce an abortion on a pregnant woman with the specific intent of causing or abetting an abortion if the unborn child's fetal heartbeat has been detected."  S.C. Code Ann. § 44-41-630(B) (Supp. 2024); *see also Planned Parenthood II*, 440 S.C. at 474, 892 S.E.2d at 126 ("The 2023 Act generally prohibits an abortion after the detection of a fetal heartbeat, not at a specified period of weeks into the pregnancy.").

The disputed definition reads:

> "Fetal heartbeat" means cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac.

§ 44-41-610(6).

Planned Parenthood argues that, under this definition, a "fetal heartbeat" does not occur until after the four chambers of the heart have formed, which—using "a specified period of weeks" as shorthand—it contends occurs only "after approximately nine weeks of pregnancy."[1]  The State argues—also in shorthand—a "fetal heartbeat" occurs at "approximately six weeks of pregnancy."  Throughout the legislative process for this Act and the 2021 Fetal Heartbeat and Protection from Abortion Act, as well as the three rounds of litigation over their constitutionality and now the definition of "fetal heartbeat," the parties to the litigation, the members of this Court, and legislators used this shorthand—"a specified period of weeks"—to describe their understanding of when the prohibition on abortion in both Acts begins.

Now that we squarely address the definition of "fetal heartbeat" in the 2023 Act, our interpretation of the term is not based on an assessment of the number of weeks a woman has been pregnant.  Instead, it is based on medically and objectively

---

[1] Both Planned Parenthood and the State use the "gestational age" method of dating pregnancy.  The Act provides "gestational age" is to be measured "from the first day of the last menstrual period of a pregnant woman."  S.C. Code Ann. § 44-41-610(7) (Supp. 2024).  When we discuss a "period of weeks" of pregnancy in this opinion, we are referring to the "gestational age" of the "unborn child" as those terms are defined in the Act.  *See also* S.C. Code Ann. § 44-41-610(14) (Supp. 2024) (defining "unborn child").

observable evidence that a medical professional may identify. Tracking the language of the 2023 Act, we hold the term "fetal heartbeat" refers to "a biologically identifiable moment in time," 2023 S.C. Acts at 384 § 1(2), which a medical professional may objectively determine to have occurred by the existence of the "cardiac activity" of electrical impulses detectable as a "sound" with diagnostic medical technology such as a transvaginal ultrasound device. Under the 2023 Act, this cardiac activity marks the point beyond which most abortions may not be carried out when the medical professional observes it as a "steady and repetitive rhythmic contraction of the fetal heart" during any stage of the heart's development "within the gestational sac."

While we do not frame our holding today in the shorthand terms of a number of weeks, the biologically identifiable moment in time we hold is the "fetal heartbeat" under the 2023 Act occurs in most instances at approximately six weeks of pregnancy.

## I.      Background

Our journey to this point began in 2021 when the South Carolina General Assembly enacted the Fetal Heartbeat and Protection from Abortion Act. Act No. 1, 2021 S.C. Acts 2 (effective Feb. 18, 2021). Initially, the federal district court enjoined enforcement of the 2021 Act because it plainly violated the Supreme Court of the United States' interpretation of the Constitution of the United States in *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992). *Planned Parenthood S. Atl. v. Wilson*, 527 F. Supp. 3d 801, 817 (D.S.C. 2021), *aff'd*, 26 F.4th 600 (4th Cir. 2022). In June 2022, however, the Supreme Court overruled *Roe* and *Casey* in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 231, 142 S. Ct. 2228, 2242, 213 L. Ed. 2d 545, 560 (2022). The district court then lifted its injunction, and the 2021 Act became effective. *Planned Parenthood S. Atl. v. Wilson*, No. 3:21-00508-MGL, 2022 WL 2905496, at *4 (D.S.C. July 22, 2022).

Planned Parenthood immediately filed an action in this Court's original jurisdiction challenging the constitutionality of the 2021 Act under the South Carolina Constitution. *Planned Parenthood S. Atl. v. State*, 438 S.C. 188, 197, 882 S.E.2d 770, 775 (2023) (*Planned Parenthood I*). Pending our resolution of the state constitutional question, we unanimously granted a temporary injunction against enforcement of the 2021 Act. In January 2023, a majority of the Court held the 2021 Act unconstitutional. 438 S.C. at 195, 882 S.E.2d at 774.

In response to that decision, the General Assembly revised the 2021 Act and enacted a new version of the Fetal Heartbeat and Protection from Abortion Act. Act No. 70, 2023 S.C. Acts 383 (effective May 25, 2023) (codified at S.C. Code Ann. §§ 44-41-610 to -690 (Supp. 2024)). The definition of "fetal heartbeat" in the 2023 Act—quoted above—is identical to the definition the General Assembly used in the 2021 Act. *Compare* § 44-41-610(6), *with* 2021 S.C. Acts at 3. Immediately after the Governor signed the 2023 Act, Planned Parenthood and several other abortion providers filed an action in circuit court seeking a declaration that the 2023 Act is also unconstitutional. The circuit court agreed with Planned Parenthood, declared the 2023 Act unconstitutional, and issued an injunction against its enforcement.

In August 2023 in *Planned Parenthood II*, this Court disagreed with Planned Parenthood and declared the 2023 Act is constitutional. 440 S.C. at 472, 892 S.E.2d at 125. In doing so, however, we declined to address the definition of "fetal heartbeat," stating, "We leave for another day . . . the meaning of 'fetal heartbeat' . . . ." 440 S.C. at 474 n.4, 892 S.E.2d at 126 n.4.

After *Planned Parenthood II*, Planned Parenthood and two other plaintiffs filed an action in our original jurisdiction seeking an answer to the question we declined to address in *Planned Parenthood II*: "the meaning of 'fetal heartbeat.'" Specifically, it sought clarification of the time period during which an abortion may legally be performed. We denied Planned Parenthood's request that we hear the case in our original jurisdiction but permitted Planned Parenthood to file a similar action in circuit court.

Planned Parenthood then filed this action against the State and others in circuit court seeking "a declaratory judgment . . . that, consistent with the plain language of the Act: (1) 'cardiac activity' is modified by 'the steady and repetitive rhythmic contraction of the fetal heart' such that the two phrases refer to one point in time during pregnancy, and (2) the relevant point in time addressed by the Act is the point when a heart has formed, which is after approximately nine weeks." Both parties submitted affidavits or reports from medical experts describing contrary views of the purported "medical consensus" regarding the definition of "fetal heartbeat." The circuit court ruled for the State, and Planned Parenthood appealed. We certified the appeal to this Court pursuant to Rule 204(b), SCACR.

## II.     Interpretation of the Definition of "Fetal Heartbeat"

"The first question to be asked when interpreting a statute is whether the statute's meaning is clear on its face." *Creswick v. Univ. of S.C.*, 434 S.C. 77, 81, 862 S.E.2d 706, 708 (2021) (citing *Kennedy v. S.C. Ret. Sys.*, 345 S.C. 339, 346, 549 S.E.2d 243, 246 (2001)).  If the text of a statute is "plain and unambiguous, and conveys a clear and definite meaning," there is nothing for a court to do except to apply the plain meaning.  *Kennedy*, 345 S.C. at 346, 549 S.E.2d at 246 (quoting *Paschal v. State Election Comm'n*, 317 S.C. 434, 436, 454 S.E.2d 890, 892 (1995)).  If a statute does not convey a clear and definite meaning, however, then the court "must apply the rules of statutory interpretation" and "search for that intent beyond the borders of the act itself."  345 S.C. at 348, 549 S.E.2d at 247.  This is not at all to say the text of the statute becomes unimportant, for even as to an ambiguous statute, the text remains the most reliable evidence of legislative intent.  *See Hodges*, 341 S.C. at 85, 533 S.E.2d at 581 ("What a legislature says in the text of a statute is considered the best evidence of the legislative intent . . . ." (quoting Norman J. Singer, *Sutherland Statutory Construction* § 46.03 at 94 (5th ed. 1992))); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 2, at 56 (2012) ("When deciding an issue governed by the text of a legal instrument, the careful lawyer or judge trusts neither memory nor paraphrase, but examines the very words of the instrument.").

We find the definition of "fetal heartbeat" in the 2023 Act is ambiguous and does not convey a clear, definite meaning.  Not one of the terms the General Assembly used in the definition—not "cardiac activity" nor "steady," "repetitive," "rhythmic," "contraction," "fetal heart," nor even "gestational sac"—is a precise, medically-defined term.  As to each of these terms, medical professionals disagree on their precise meaning.[2]  Thus, we must turn to the rules of statutory construction and other evidence of what the General Assembly intended.

---

[2] The term "gestational sac" is more of a medical term than the others, but even it does not have a precise meaning.  *Compare* Olga Dewald & Jennifer T. Hoffman, *Gestational Sac Evaluation* (2023) ("The gestational sac is a fluid-filled structure surrounding an embryo during the first few weeks of embryonic development."), *with* Jennifer J. Adibi et al., *First Trimester Mechanisms of Gestational Sac Placental and Foetal Teratogenicity: A Framework for Birth Cohort Studies*, 27 HUM. REPROD. UPDATE 747, 748 (2021) ("The [gestational sac] is the term used to describe the placenta-embryo during the period of organogenesis . . . and includes multiple structures.").

In this case, we find two decisive indications of legislative intent. The first is a particular aspect of the legislative history of the 2023 Act, considered against the backdrop of a consistent and exclusive pattern of the parties, the members of this Court, and the Representatives and Senators who debated and enacted the 2021 and 2023 Acts, all referring to both Acts as a "six-week" abortion ban. The second is the legislative finding—expressed by the General Assembly in both the 2021 and 2023 Acts—that "a fetal heartbeat is a key medical predictor that an unborn child will reach live birth." 2023 S.C. Acts at 384 § 1(1); *see also* 2021 S.C. Acts at 3 §§ 1(2), (5) (finding "fewer than five percent of all natural pregnancies end in spontaneous miscarriage after the detection of a fetal heartbeat" and "a fetal heartbeat is a key medical predictor that an unborn human individual will reach live birth"). After we discuss these two decisive indicators of legislative intent, we will return to the text and explain that this "best evidence of the legislative intent" also supports our determination. Finally, we will discuss other indicators of legislative intent that Planned Parenthood contends support its suggested interpretation of the definition of "fetal heartbeat," and we will provide the reasons none of those persuade us that Planned Parenthood's interpretation is the correct one.

### A.    Legislative History

When Planned Parenthood sought the initial injunction in federal district court in 2021, Planned Parenthood itself referred to the 2021 Act in its motion to the court as a "Six-Week Ban." *Planned Parenthood S. Atl. v. Wilson*, 527 F. Supp. 3d at 809 (quoting Planned Parenthood's "'motion for a temporary restraining order (TRO) and preliminary injunction' at 11, 13"). Likewise, the district court described the 2021 Act as banning abortions "as early as six weeks of pregnancy" when it issued the injunction, and the United States Court of Appeals for the Fourth Circuit called it "the six-week abortion ban" when it affirmed the injunction. *Planned Parenthood S. Atl. v. Wilson*, 527 F. Supp. 3d at 810; 26 F.4th at 606. In its briefs to this Court in the first round of this litigation, Planned Parenthood said nothing of a nine-week timeframe, but twelve separate times specifically referred to the 2021 Act as a "six-week" abortion ban. At oral argument in the first round, Planned Parenthood informed us, "The Court has before it . . . a statute that bans abortions at six weeks of pregnancy." In the three opinions explaining the majority result in *Planned Parenthood I*, although the reasoning of the opinions varied significantly, each Justice consistently and exclusively referred to the 2021 Act as a "six-week" ban. *See, e.g.*, *Planned Parenthood I*, 438 S.C. at 195, 216-17, 882 S.E.2d at 774, 785-86 (Hearn, J., lead opinion); 438 S.C. at 237-38, 882 S.E.2d at 797 (Beatty, C.J., concurring); 438 S.C. at 278, 882 S.E.2d at 818 (Few, J., concurring in result). In

fact, Planned Parenthood—which now contends a "fetal heartbeat" does not occur under the 2023 Act until after nine weeks of pregnancy—has not cited to us even one instance in which it,[3] the State, or a Justice of this Court referred to the identical 2021 definition of "fetal heartbeat" as anything other than the point in time that marks an approximately six-week ban.

We have recognized that the General Assembly "is presumed to be aware of this Court's interpretation of its statutes." *State v. 192 Coin-Operated Video Game Machines*, 338 S.C. 176, 188, 525 S.E.2d 872, 879 (2000) (citing *Whitner v. State*, 328 S.C. 1, 6, 492 S.E.2d 777, 779 (1997)). In this situation, however, no such presumption is necessary, as this Court's references to the 2021 Act as a six-week ban in *Planned Parenthood I* were a constant point of conversation in the House and Senate during the debates on the 2023 Act. One House member, for example, stated on the floor of the House—referring to this Court's opinions in *Planned Parenthood I*—"There is a Court opinion, multiple Court opinions, that say at six weeks, most women don't even know that they are pregnant." In other instances, House members and Senators quoted one or more Justice's opinion in *Planned Parenthood I* in which the Justice made specific reference to "the first six weeks of pregnancy."

We acknowledge that this "judicial history" has no independent significance to the General Assembly's intent in enacting the 2023 Act, and in particular in choosing to use the same definition of "fetal heartbeat" in the 2023 Act as it used in the 2021 Act. Under the unique circumstances of this case, however, the consistent and exclusive references by Planned Parenthood and this Court to the 2021 Act as a six-week ban provide a backdrop against which the legislative history of the 2023 Act proves decisive in our determination of legislative intent.

We have often stated legislative history can be important in identifying legislative intent. *See, e.g.*, *Limehouse v. Hulsey*, 404 S.C. 93, 106, 744 S.E.2d 566, 573 (2013) ("[A]s the rules of statutory construction dictate, it is also necessary for courts to consider the legislative history in order to effectuate the purpose of the statute."). We have used legislative history in numerous cases as an aid in discerning our General Assembly's intent in enacting a statute. *See, e.g.*, *Beaufort Cnty. v. S.C.*

---

[3] This case is the first time Planned Parenthood has argued that either the 2021 or 2023 Act bans abortion later than six weeks of pregnancy. The State noted at oral argument that Planned Parenthood used the phrase "Six-Week Ban" more than 300 times in its various filings prior to this case.

*State Election Comm'n*, 395 S.C. 366, 376 n.4, 718 S.E.2d 432, 437 n.4 (2011) (referencing the rejection of an amendment in the House Journal in "ascertaining legislative intent"); *State Farm Mut. Auto. Ins. Co. v. Richardson*, 313 S.C. 58, 61 & n.2, 437 S.E.2d 43, 45 & n.2 (1993) (referencing "a Conference Committee report adopted by both Houses of the General Assembly" to "ascertain and effectuate the legislature's intent"); *Mullis v. Celanese Corp. of Am.*, 234 S.C. 380, 392-93, 108 S.E.2d 547, 552-53 (1959) (referencing committee reports to understand the "legislative background" of statute).

Though our courts have also acknowledged that legislative history is sometimes unreliable,[4] we have held in some cases that it alone can be decisive. In *Kennedy*, for example, the question before the Court was the General Assembly's intent in amending the statutory definition of a term used to calculate retirement benefits for State employees. 345 S.C. at 345, 549 S.E.2d at 246. The Court observed that if the employees' proposed interpretation of the amended term was adopted, it would result in an "unfunded liability" of "1.177 billion dollars" for the State Retirement System, and thus the General Assembly "would have been dramatically increasing the payments to retirees" by redefining the term. 345 S.C. at 349, 549 S.E.2d at 248. If this were the General Assembly's intent, the Court hypothesized, "it is reasonable to assume the history and circumstances surrounding the amendment would indicate the General Assembly intended to increase benefits." *Id.* On the other hand, the Court continued, "it is hard to imagine . . . there would have been little debate or controversy had everyone been aware the amendment would mean a dramatic increase in retirement benefits." 345 S.C. at 350 n.12, 549 S.E.2d at 248 n.12. In the particular situation of *Kennedy*, therefore, we found "[t]he most powerful indication of legislative intent is the lack of legislative history and debate" on what would surely have been such a controversial legislative act. 345 S.C. at 348, 549 S.E.2d at 247.

In *Kennedy*, because the employees' proposed interpretation of the amended statutory definition would have resulted in an unfunded liability exceeding one billion dollars, and yet no member of the General Assembly even mentioned this unlikely outcome, it was clear that this interpretation was not what the General Assembly intended. The lack of any mention of such a "dramatic increase" in the

---

[4] *See, e.g.*, *S. Bell Tel. & Tel. Co. v. S.C. Tax Comm'n*, 297 S.C. 492, 493-94, 494 n.1, 377 S.E.2d 358, 360, 360 n.1 (Ct. App. 1989) (holding "[legislative] history of the statute is instructive, if not conclusive, in this case," but observing in footnote one that in some cases it can be misleading).

expenditure of State retirement funds gave the Court a clear basis on which it could explain that the General Assembly did not intend what the employees argued it intended.

We see the same situation here. Everyone—particularly the members of this Court—consistently and exclusively discussed the 2021 Act in terms of it being a six-week abortion ban. If the General Assembly intended, in defining "fetal heartbeat" in the 2023 Act exactly as it defined it in the 2021 Act, that the 2023 Act would ban most abortions at a "biologically identifiable moment in time" other than when electrical impulses are detectable on an ultrasound—which even Planned Parenthood acknowledges occurs at approximately six weeks of pregnancy[5]—it is inconceivable that no member of the House or Senate made any effort to point out that the members of this Court misunderstood the General Assembly's intent.

Not only did the General Assembly say nothing of any misunderstanding on our part in referring to the 2021 Act as a six-week abortion ban, but the General Assembly itself debated and discussed the 2023 Act exclusively in terms of a six-week threshold beyond which most abortions may not occur. We count at least sixty separate instances during the 2023 legislative session in which a member of the House or Senate referred to the 2023 Act as a six-week ban on abortion, many of which specifically referenced the Court's analysis of the 2021 Act. We found no instance where a member of the General Assembly made any reference to any period of time other than six weeks. In particular, we could find not one instance during the entire 2023 legislative session in which anyone connected in any way to the General Assembly framed the Act as banning abortion after approximately nine weeks.

In addition to that, opponents of the bill introduced amendments that were clearly intended to counteract what the amendment sponsors saw as negative consequences of the six-week ban. For example, Amendments 79, 144, and 147—each introduced by members of the House who ultimately opposed the 2023 Act—sought to hold a father liable for child support "starting at week six of the pregnancy" and to create

_____

[5] To be clear, Planned Parenthood does not agree the definition was intended to mean a point in time of approximately six weeks. It does agree, however, that "embryonic electrical activity is detectable after approximately six weeks of pregnancy." *See also infra* Section II.C (discussing Planned Parenthood's acknowledgment "there is repetitive detectable embryonic electrical activity after approximately six weeks" of pregnancy).

"travel costs" and "childcare" funds the sponsors argued were necessitated "because of the six-week ban."  While none of these Amendments passed, they each clearly indicate the members proposing them—again, opponents of the Act—considered the 2023 Act to be effective upon events occurring at approximately six weeks of pregnancy.

This extensive 2023 legislative history—considered in view of the judicial history of *Planned Parenthood I*—is decisive.  The following facts—the 2023 General Assembly heard the Court's discussion of a six-week ban at oral argument in *Planned Parenthood I*, read what the Court wrote in *Planned Parenthood I* about the 2021 Act being a six-week ban, consistently and exclusively mentioned the Court's analysis in *Planned Parenthood I* as turning on the six-week time frame, turned right around and included the exact same definition of "fetal heartbeat" in the 2023 Act, and then consistently and exclusively discussed the 2023 Act as a six-week ban, all without so much as a passing comment about whether the Court misunderstood the Act—together conclusively demonstrate that the General Assembly did not intend to ban abortions at the point in time Planned Parenthood now argues.

As was true in *Kennedy*, the Court can look at this legislative history and from it definitively explain that the General Assembly did not intend what one party argues.  Thus, as in *Kennedy*, we do not use this "legislative silence" to conclude what the General Assembly *did mean*, but rather, as a crystal-clear indicator of what the General Assembly *did not mean*.  In this case, it then becomes clear the General Assembly intended to ban abortions at the "biologically identifiable moment in time" we explained when we stated our interpretation of "fetal heartbeat" at the outset of this opinion.[6]

## B.  "Fetal Heartbeat" as a Key Medical Predictor

The second particularly important indication of the General Assembly's intent comes from the legislative policy finding that a "fetal heartbeat" is "a key medical predictor that an unborn child will reach live birth."  This "finding" by the General Assembly

---

[6] We read *Kennedy* narrowly.  Likewise, our reliance on legislative history in this case should be read narrowly.  In both cases, the significance of the legislative history is that it eliminates one possible interpretation of a statute.  Thus, *Kennedy* and this case are unlike other cases in which we have refused to consider isolated statements of legislators as indications of what the entire General Assembly intended.

raises the important question of what point in time the General Assembly was referring to when it made this correlation. The answer to the question is clear: the General Assembly was referring to the occurrence of electrical impulses that mark the early onset of "cardiac activity" as we interpret "fetal heartbeat"; the General Assembly was not referring to the beating of the four chambers of a more fully-developed heart that does not occur until after nine weeks of pregnancy.

In part, the clarity of the answer to this question is found in the exclusive "six-week" discussion throughout the entire legislative history of both Acts, particularly the discussion in the 2023 legislative session that we have carefully analyzed against the backdrop of *Planned Parenthood I*. More specifically, also referring back to our opinions in *Planned Parenthood I*, Chief Justice Kittredge wrote in his dissent:

> According to data in the record, fetal heartbeat activity may be detected at approximately six to eight weeks into the pregnancy. In considering the Act, the legislature made findings in support of its policy decision to restrict most abortions at the time the fetal heartbeat is detected. Those legislative findings, based on medical information, include "a fetal heartbeat is a key medical predictor that an unborn human individual will reach live birth." The legislature relied on medical data reflecting a greater than 95% likelihood of reaching live birth upon detection of the fetal heartbeat.

438 S.C. at 302, 882 S.E.2d at 831 (Kittredge, J., dissenting) (citation omitted).

Chief Justice Kittredge's statement placed squarely into the debate for the 2023 legislative process the point now under discussion—that the 2021 General Assembly was referring to "fetal heartbeat activity [that] may be detected at approximately six to eight weeks" when it drew the correlation between the "fetal heartbeat" and the high probability of the unborn child reaching live birth. The General Assembly essentially summarized the same findings in the 2023 Act Chief Justice Kittredge was referring to from the 2021 Act. If the General Assembly intended the correlation on which it relied so heavily for the 2021 Act to refer to a point in time after nine weeks of pregnancy, it is difficult to imagine the General Assembly would not have substantively amended the finding in 2023—or at the very least discussed the possibility of doing so—to align with Planned Parenthood's interpretation. Instead, the General Assembly effectively remade the 2021 finding in the 2023 Act.

There is other evidence of the point in time the General Assembly was referring to when it drew the correlation, and all of that evidence points inevitably to the electrical impulses we referred to at the outset of this opinion. One such source of evidence is a statement in the Senate Journal in which three Senators explained what the General Assembly considered when debating the Act:

> The Senate took into consideration the interests of the pregnant woman and balanced them against the legitimate interest of the State to protect the life of the unborn. The Senate looked to experts in the field—such as the Cleveland Clinic and the American Pregnancy Association (among others)—for guidance concerning the scientific understanding of the development of the unborn early in pregnancy. Finally, the Senate decided that the proper balance should be struck at the point of a fetal heartbeat—that is, at the point where a fetal heartbeat is detectable a woman could have known that she was pregnant for a little more than a month and that she had ample time to make a decision about whether to terminate her pregnancy.

S. 474, S. Journal, 125th Sess. at 998-99 (S.C. Feb. 9, 2023). The statement makes clear the 2023 General Assembly looked to medical and scientific "experts" for its "understanding of the development of the unborn early in pregnancy." This, in turn, indicates the General Assembly relied on medical and scientific knowledge—like the 2021 General Assembly "relied on medical data"[7]—in drawing the correlation it found so important. All of the medical and scientific knowledge that has been shown to us in this case points to the same early "cardiac activity" detectable as electric impulses on an ultrasound—which we held at the outset of this opinion marks the "fetal heartbeat"—as the point in time that indicates an unborn child is likely to reach live birth, and to which the General Assembly drew its correlation.[8] This statement

---

[7] *See* 438 S.C. at 302, 882 S.E.2d at 831 (Kittredge, J., dissenting).

[8] As an example of this "knowledge," a 2004 study included in the record before us found that among women who were between six weeks and eight weeks plus one day pregnant—and who did not have a history of recurrent pregnancy loss—98% of those with an "embryonic heart rate" reached live birth. Jennifer S. Hyer et al., *Predictive value of the presence of an embryonic heartbeat for live birth:*

in the Senate Journal indicates that, based on its view of that medical and scientific knowledge, the General Assembly determined the event which correlates so strongly with an eventual live birth is when electrical impulses are first detectable, which is generally around six weeks of pregnancy. Certainly, we must defer to this legislative determination,[9] but that is not the point here. The point is the General Assembly would not have stressed a high correlation between when electrical impulses are first detectable and an eventual live birth if it intended some other point in time when it defined "fetal heartbeat" in the 2023 Act.

As a final indication of the point in time the General Assembly was referring to when it drew the correlation between a "fetal heartbeat" and an eventual live birth, we turn to the nearly identical "heartbeat laws" passed in other states that have been universally understood to ban abortions at approximately six weeks of pregnancy. For example, Texas's 2021 statute defined "fetal heartbeat" the same way South Carolina does, but without the commas. *See* Tex. Health & Safety Code Ann. § 171.201(1) (West 2021) ("'Fetal heartbeat' means cardiac activity or the steady and repetitive rhythmic contraction of the fetal heart within the gestational sac.").[10] The Texas legislature also made a very similar finding to our General Assembly's finding about a "fetal heartbeat" being a "key medical predictor that an unborn child will reach live birth." *See* Tex. Health & Safety Code Ann. § 171.202(1) (West 2021) ("The legislature finds, according to contemporary medical research, that: . . . fetal heartbeat has become a key medical predictor that an unborn child will reach live birth[.]"). Chief Justice Roberts and Justice Sotomayor in *Whole Woman's Health v. Jackson*, 595 U.S. 30, 142 S. Ct. 522, 211 L. Ed. 2d 316 (2021), described Texas's statute as banning abortions after "roughly" or "approximately" six weeks of pregnancy. *See* 595 U.S. at 58, 142 S. Ct. at 543, 211 L. Ed. 2d at 338 (Roberts, C.J., concurring in part and dissenting in part) ("Texas has passed a law banning abortions after roughly six weeks of pregnancy."); 595 U.S. at 62, 142 S. Ct. at 545,

---

*comparison of women with and without recurrent pregnancy loss*, 82 FERTILITY AND STERILITY 1369, 1371 (2004).

[9] *Planned Parenthood II*, 440 S.C. at 475, 892 S.E.2d at 127; *see also id.* ("This deference is not diminished simply because there is medical support for 'both sides' of an issue." (citing *Gonzales v. Carhart*, 550 U.S. 124, 161, 127 S. Ct. 1610, 1635, 167 L. Ed. 2d 480, 512 (2007))).

[10] Although Texas now has a total abortion ban, the Texas heartbeat law has not been repealed. *See* Tex. Health & Safety Code Ann. §§ 170A.001-7 (West 2022).

211 L. Ed. 2d at 341 (Sotomayor, J., concurring in part and dissenting in part) ("Texas enacted Senate Bill 8 (S. B. 8), which bans abortion starting approximately six weeks after a woman's last menstrual period . . . ."). This provides evidence our General Assembly made its correlation when enacting the 2023 Act to the medically and objectively observable evidence we referred to above when we interpreted the term "fetal heartbeat" at the outset of this opinion, as there is no indication from the legislative record or statutory language that South Carolina sought to deviate from Chief Justice Roberts's or Justice Sotomayor's understanding. *See Orr v. Clyburn*, 277 S.C. 536, 540, 290 S.E.2d 804, 806 (1982) ("Under general rules of statutory construction, a jurisdiction adopting legislation from another jurisdiction imports with it the judicial gloss interpreting that legislation." (citations omitted)).[11]

Our General Assembly based its determination of the appropriate point in time at which to ban most abortions on a correlation between a pregnancy reaching a particular point and a high likelihood the pregnancy would eventually yield a live birth. In making that correlation, the General Assembly clearly was referring to the early cardiac activity of electrical impulses we have consistently referred to in this opinion. This clearly indicates the General Assembly intended to ban most abortions at the point in time we described when we interpreted "fetal heartbeat" at the outset of this opinion.

## C.     The Text of the "Fetal Heartbeat" Definition

We now return to the text of the definition of "fetal heartbeat" and explain that the text supports our holding. We begin this explanation with the various arguments made by Planned Parenthood that the text of the definition must be interpreted to ban abortions after approximately nine weeks of pregnancy. Specifically, Planned Parenthood argues (1) the heartbeat is not "steady" or "rhythmic" until after approximately nine weeks of pregnancy, (2) the heart has not "formed" until after nine weeks, (3) the use of the word "heartbeat" is incorrect to describe what may be detected on an ultrasound as electrical impulses, and (4) the Act uses the word "fetal"

---

[11] Planned Parenthood contends South Carolina's statute is materially different from Texas's statute because Texas defines "unborn child" as "a human fetus or embryo in any stage of gestation from fertilization until birth." Tex. Health & Safety Code Ann. § 171.201(7). South Carolina's definition of "unborn child," however, includes the exact same time frame—using slightly different terms—as Texas's statute, as it defines the term as "an individual organism of the species homo sapiens from conception until live birth." S.C. Code Ann. § 44-41-610(14).

instead of "embryonic" and there is no "fetus" but only an "embryo" when the electrical impulses we have described become detectable on an ultrasound.

First, Planned Parenthood focuses on the words "steady" and "rhythmic." It argues that "while there is repetitive detectable embryonic electrical activity after approximately six weeks, that activity is not steady or rhythmic until after approximately nine weeks . . . ." Planned Parenthood continues, "This is because the pacemaker and conduction systems, which are necessary for a steady and rhythmic coordinated heartbeat, have not formed yet." Thus, Planned Parenthood argues the "steady" and "rhythmic" requirements in the definition should be interpreted as banning abortion after approximately nine weeks. However, neither party explains in medical terms what the words "steady" or "rhythmic" actually mean. In fact, when explaining in its briefs the definitions of "steady," "rhythm," and even "cardiac," Planned Parenthood cites the online version of *The American Heritage Dictionary of the English Language* instead of a medical dictionary or treatise. The parties do not explain the *medical* definitions of these words because there is not one; none of them have a precise meaning in the medical field. Using the common, ordinary understanding of these words, the text of the definition of "fetal heartbeat" describes what a medical professional may observe as electrical impulses on an ultrasound at approximately six weeks of pregnancy. There is nothing in the text of the definition of "fetal heartbeat"—without adding words like "coordinated" or concepts like "pacemaker and conduction systems" as Planned Parenthood asks us to do—that indicates the moment in time the definition describes is later than we have explained.

Second, Planned Parenthood focuses on the words "heart" and "formed." It points to the finding by the General Assembly, "Cardiac activity begins at a biologically identifiable moment in time, normally when the fetal *heart is formed* in the gestational sac." 2023 S.C. Acts at 384 § 1(2) (emphasis added). Planned Parenthood argues the plain meaning of the Act bans abortion only after all four chambers have "formed" because until then there is no "heart." Thus, Planned Parenthood argues, the time "when the fetal heart is formed" is when it has developed all four chambers after approximately nine weeks of pregnancy. The State concedes that the four chambers of the heart are not formed when it contends the Act bans abortion, but it disagrees as to what has to happen before a heart can be said to have "formed." Even under Planned Parenthood's theory on this argument, however, it is not at all clear that the time a heart is "formed" matches the point in time Planned Parenthood suggests for the occurrence of a "fetal heartbeat." In fact, there is medical evidence in the record—provided by Planned Parenthood—that the heart is not fully formed until ten weeks or even later. Thus, the text "when the fetal heart

is formed" does not point to a specific point in time, and supports the State's position—and our holding today—as strongly as it supports the arguments of Planned Parenthood.

Third, and relatedly, Planned Parenthood focuses on the word "heartbeat." It argues, "The term 'heartbeat' is a misnomer because a cardiovascular system has yet to develop at this point." It argues "early embryonic electrical activity cannot be heard as a heartbeat can. Instead, at this early gestational age, it is the ultrasound machine itself that converts these electrical impulses into sound." Planned Parenthood acknowledges in its brief, however, "Physicians and scientists may use different verbiage in talking about cardiac development at different stages of pregnancy. For example, some may use the term 'heartbeat' to refer to early embryonic electrical activity." Appellants' Br. at 8 n.5. Thus, we believe the General Assembly's use of the word "heartbeat" supports the State's position as strongly as it supports the arguments of Planned Parenthood.

Fourth, Planned Parenthood focuses on the word "fetal." It argues "it is uncontroverted that there is no 'fetus' until after nine weeks of pregnancy, as at six weeks there is only an embryo." It continues "the General Assembly repeatedly emphasized that the presence of a *fetal* heart or 'heartbeat' is the key medical marker" for the time in pregnancy after which abortion is prohibited. Planned Parenthood argues, "By using the specific terms fetal and fetus—rather than embryonic or embryo—the General Assembly's chosen language expresses an unambiguous intention to ban abortions only after approximately nine weeks." However, Planned Parenthood's argument that the noun "fetus" cannot apply to a six-week embryo does not control how the General Assembly may have decided to use the adjective "fetal." To illustrate the point, we turn to the definition of "fatal fetal anomaly" in the 2023 Act, which is "that, in reasonable medical judgment, the *unborn child* has a profound and irremediable congenital or chromosomal anomaly that, with or without the provision of life-preserving treatment, would be incompatible with sustaining life after birth." S.C. Code Ann. § 44-41-610(5) (Supp. 2024) (emphasis added). Subsection 44-41-610(14) of the Act defines "unborn child" as "an individual organism of the species homo sapiens from conception until live birth." The General Assembly's use of the word "fetal" to refer to all unborn children in subsection 44-41-610(5) demonstrates the General Assembly intended to use the word as an imprecise adjective to refer to the "unborn child" generally. This, in turn, is strong evidence the General Assembly did not intend to restrict the application of the Act to only a precisely-defined "fetus" as opposed to an "embryo." *See S.C. State Ports Auth. v. Jasper Cnty.*, 368 S.C. 388, 398, 629 S.E.2d 624, 629 (2006) ("In construing statutory language, the statute must be read as a whole and sections which are a part

of the same general statutory law must be construed together and each one given effect.").

In addition, the General Assembly used the words "embryo" and "fetus" interchangeably in the Woman's Right to Know Act. *See* S.C. Code Ann. § 44-41-320(2) (2018) ("'Probable gestational age of the *embryo or fetus*' means what, in the judgment of the attending physician based upon the attending physician's examination and the woman's medical history, is with reasonable probability the gestational age of the *embryo or fetus* at the time the abortion is planned to be performed." (emphasis added)). The 2023 Act specifically incorporates the Woman's Right to Know Act into its subsection 44-41-630(B) prohibition of abortion, stating "no person shall perform or induce an abortion on a pregnant woman with the specific intent of causing or abetting an abortion if the unborn child's fetal heartbeat has been detected in accordance with Section 44-41-330(A)." Subsections 44-41-320(2) and 44-41-330(A) are parts of the Woman's Right to Know Act. It is highly unlikely—perhaps inconceivable as we said in other contexts here—the General Assembly would incorporate its synonymous treatment of "fetus" and "embryo" in the Women's Right to Know Act into the 2023 Fetal Heartbeat and Protection from Abortion Act in which it intended to treat "fetal" and "embryonic" as antonyms.

Further as to its fourth textual argument, Planned Parenthood has not specified a clear "biologically identifiable moment in time" at which a medical professional may observe that an "embryo" has developed into a "fetus." When pressed at oral argument to identify the objective criteria a medical professional would use in making the determination whether an embryo has developed into a fetus in any particular pregnancy, Planned Parenthood identified two criteria. First, Planned Parenthood stated the medical professional would measure the "crown-rump length." However, Planned Parenthood was unable to say what the decisive measurement would be that would indicate the embryo had completed the transition into a fetus, nor have we been able to do so. In fact, the crown-rump length is used primarily to assess gestational age, and gestational age, in turn, is an indication of whether an embryo has developed into a fetus. Second, Planned Parenthood stated the medical professional would rely on the mother's subjectively reported number of weeks since her last menstrual period. In its briefs, and in this exchange during oral argument, Planned Parenthood argued only that the transition happens at a number of weeks of pregnancy. At oral argument, however, Planned Parenthood acknowledged there is "variation" from medical professionals on the time in a pregnancy that this transition takes place. All of this uncertainty—combined with our discussion above that the General Assembly used the adjective "fetal" to describe all unborn children, and the

General Assembly incorporated into the 2023 Act its synonymous treatment of "fetus" and "embryo" from the Women's Right to Know Act—undermines any value the existence of a "fetus" may have in determining the intent of the General Assembly in defining "fetal heartbeat."

Finally as to the text, we turn to the General Assembly's use of the word "detected," defining the point in time when the Act bans abortion as when "the unborn child's fetal heartbeat has been *detected*." § 44-41-630(B) (emphasis added). Planned Parenthood argues the plain language of the Act bans abortion when a doctor determines the woman has been pregnant for a certain number of weeks. The word "detected" is crucial, however, because it refers to an actual, observable event—the moment when a medical professional may *first perceive* cardiac activity through medical instruments, such as an ultrasound—rather than an estimated gestational age. The word "detected" distinguishes the moment it refers to from when cardiac activity cannot be detected. The only point in the progression of a pregnancy when cardiac activity goes from "cannot be detected" to "detected" is the point in time we have described in this opinion as when the General Assembly intended to ban most abortions.

Considering the text of the entire 2023 Act and the Woman's Right to Know Act, we find the text of the definition of "fetal heartbeat"—although by itself it does not convey a clear and definite meaning—supports our interpretation of the definition.

### D.     Competing Indications of Intent from Outside the Text

As the entirety of this opinion demonstrates, a court's effort to discern legislative intent when the text does not convey a clear and definite meaning will almost always reveal competing indications of intent. *See* Scalia, *supra*, § 3, at 59 ("Principles of interpretation are guides to solving the puzzle of textual meaning, and as in any good mystery, different clues often point in different directions. It is a rare case in which each side does not appeal to a different canon to suggest its desired outcome. The skill of sound construction lies in assessing the clarity and weight of each clue and deciding where the balance lies."). Planned Parenthood has identified several considerations outside the text of the definition that it argues indicate the General Assembly meant to foreclose most abortions only after the four chambers of the fetal heart have formed. The first three considerations we address deal with an idea we have already thoroughly considered—that the use of the adjective "fetal" instead of "embryonic" leads to the conclusion the Act does not ban abortions at the early stage of development when electrical impulses are first detectable in the unborn child. The final two are canons of statutory construction Planned Parenthood argues require us

to construe the statute in its favor—the rule of lenity and the canon of constitutional doubt.

First, Planned Parenthood argues "the Court should presume that the omission of the term 'embryonic' in South Carolina's version of a 'fetal heartbeat' ban is intended to be materially different from the otherwise similar laws enacted in other jurisdictions" because "many other so-called 'heartbeat' bans in sister states use the term 'embryonic' in addition to 'fetal.'" It is true that some states use the word "embryonic" in addition to "fetal" in their "heartbeat" definitions. However, other states do not, and courts have still understood those statutes to ban abortions at approximately six weeks. *See, e.g.*, Miss. Code Ann. § 41-41-34.1(1)(a) (West 2019) ("'Fetal heartbeat' means cardiac activity or the steady and repetitive rhythmic contraction of the fetal heart within the gestational sac."); *Jackson Women's Health Org. v. Dobbs*, 379 F. Supp. 3d 549, 551 (S.D. Miss. 2019), *aff'd*, 951 F.3d 246 (5th Cir. 2020) ("Senate Bill 2116 . . . bans abortions in Mississippi after a fetal heartbeat is detected, which is as early as 6 weeks . . . ."); *supra* Section II.B (discussing Texas's "heartbeat" statute). In part for the reasons we explained in Section II.C above as to the adjective "fetal," we find little value in Planned Parenthood's argument on this point.

Second, Planned Parenthood argues two rejected amendments "that would have expanded the definition of 'fetal heartbeat' to include embryonic electrical activity" demonstrate the Act applies "only after approximately nine weeks" and not during the embryonic stage of development. Amendments 26 and 588—both proposed by opponents of the Act and both rejected by the House—would have amended the definition of "fetal heartbeat" to include "embryonic or fetal cardiac activity." However, the House voted down every single one of the more than 900 proposed amendments other than the House Judiciary Committee amendment. Thus, while rejected amendments can be persuasive evidence in some instances, the context that these amendments were simply two of 900 amendments that were rejected lessens their value in assessing legislative intent. Further, we do not know the reasons the amendments were rejected. It could be that the House rejected the amendments simply because it thought the addition of the adjective "embryonic" was unnecessary or redundant, as it is clear the General Assembly used the adjective "fetal" to apply to all unborn children, or because the legislature's intent was sufficiently covered by the term "cardiac activity." It is also likely the House perceived these two amendments among the other more than 900 to be merely an effort by those opposed to the Act to delay its passage, and not a serious effort to improve the legislation. In either case, we find little value in Planned Parenthood's argument on this point.

Third, Planned Parenthood argues the omission of a definition of "human fetus" in the 2023 Act, in comparison to the 2021 Act, further demonstrates the General Assembly's intent for "fetal heartbeat" to apply only after approximately nine weeks of pregnancy. The 2021 Act defined both "human fetus" and "unborn child" as "an individual organism of the species homo sapiens from fertilization until live birth." *See* 2021 S.C. Acts at 4. The 2023 Act omits the definition of "human fetus" and defines only "unborn child" in this way. § 44-41-610(14). Planned Parenthood argues the removal of the definition of the term "human fetus" indicates the legislature intended to apply the definition of "fetal heartbeat" to only an actual "fetus," not to an embryo at the earlier stages of development. However, it appears to us equally likely the General Assembly removed the definition of "human fetus" because it did not intend the 2023 Act to apply only in the later stages of development when the "embryo" has developed into a "fetus." Even to the extent this point favors Planned Parenthood's interpretation, like all of the evidence mentioned in this case, this must be balanced against other evidence that the Act intended to ban abortions at both the embryonic and fetal stages of development, and it is ultimately outweighed by the evidence discussed in Sections II.A and II.B of this opinion.

Fourth, Planned Parenthood argues that if the Court holds the Act is ambiguous, the Act—being penal in nature—must be strictly construed against the State under the "rule of lenity." However, this Court has applied the rule only when a party is facing civil or criminal punishment under an ambiguous statute. *See, e.g.*, *Berry v. State*, 381 S.C. 630, 633-34, 675 S.E.2d 425, 426-27 (2009) (holding the rule of lenity applied to a sentencing enhancement statute and the statute should be "resolved in favor of the accused"); *S.C. Dep't of Revenue v. Collins Ent. Corp.*, 340 S.C. 77, 79, 530 S.E.2d 635, 636 (2000) (construing a statute in favor of the civil defendant to determine the defendant was not subject to civil fines). Here, none of the appellants are currently facing criminal prosecution or any civil penalty. Thus, while the rule of lenity is a helpful tool of statutory construction in a case where a party is facing criminal or civil penalty, it is of little help in this declaratory judgment action in which no such penalty is at stake.

Fifth, Planned Parenthood argues "[b]ecause interpreting S.B. 474 to apply at six weeks . . . would present serious constitutional questions, the Court should interpret S.B. 474 to apply only after approximately nine weeks" under the "constitutional doubt canon." However, in *Planned Parenthood II*, this Court held the 2023 Act was constitutional in the face of Planned Parenthood's argument that it is a six-week ban. 440 S.C. at 485, 892 S.E.2d at 132. While we agree this canon could be of use in other contexts, it is inapplicable in this case.

### III. Vagueness

Planned Parenthood argues in the alternative that if we find the statutory language ambiguous, then the Act is unconstitutionally vague. We repeat this is the first time Planned Parenthood has ever argued either the 2021 or 2023 Acts lack clarity. While Planned Parenthood now argues its doctors are unclear as to which point in time abortion is prohibited, it has previously stated the language from both the 2021 Act and the 2023 Act clearly prohibits abortion at approximately six weeks. Thus, it seems unlikely that abortion providers at Planned Parenthood have been left to "guess as to its meaning." *See Curtis v. State*, 345 S.C. 557, 572, 549 S.E.2d 591, 598 (2001) (explaining a law is unconstitutionally vague if "a person of ordinary common intelligence must necessarily guess as to its meaning and differ as to its application" (citing *Toussaint v. State Bd. of Med. Examiners*, 303 S.C. 316, 320, 400 S.E.2d 488, 491 (1991)). However, even if some medical professionals have perceived the Act as vague on the point in time when abortions are generally prohibited, our interpretation of the term "fetal heartbeat" in this opinion will now provide clarity. *See Town of Mount Pleasant v. Chimento*, 401 S.C. 522, 534, 737 S.E.2d 830, 838 (2012) ("Even if we had not heretofore construed the statute so as to answer respondents' vagueness challenge, we could do so here . . . .").

### IV. Conclusion

Based on our interpretation of the statutory definition of "fetal heartbeat," we hold the 2023 Act bans abortion—unless an exception applies—when electrical impulses are first detectable as a "sound" with diagnostic medical technology such as a transvaginal ultrasound device and the medical professional observes those electrical impulses as a "steady and repetitive rhythmic contraction of the fetal heart" during any stage of the heart's development "within the gestational sac."

**AFFIRMED.**

**KITTREDGE, C.J., JAMES and VERDIN, JJ., concur. HILL, J., concurring in a separate opinion.**

**JUSTICE HILL:** I concur with the result the majority reaches, but write separately to cover a few points about the uses and limits of legislative history and to comment briefly on the grounds for affirmance.

Statements of individual legislators can be an important part of the legislative process, but they are not preferred guides for interpreting a statute. They can mislead, as the motives for making them can be many. *See N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history."). It is through consensus, in the democratic process, that the legislature forms its purpose; as such, and as we have often said, the best evidence of the legislature's intent is the language of the law itself. After all, the only words the legislature adopted and agreed upon are the words of the statute as passed, not the words spoken along its journey to passage. *Doe v. Keel*, 440 S.C. 427, 431, 892 S.E.2d 282, 284 (2023) ("The plain language of a statute is the best evidence of legislative intent."); *Tallevast v. Kaminski*, 146 S.C. 225, 236, 143 S.E. 796, 799–800 (1928) ("The law as it is passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the act itself, and the rule that the intention of the Legislature is the primary consideration in the construction of a statute does not permit the courts to consider statements made by the author of a bill or by those interested in its passage, or by members of the Legislature adopting the bill, showing the meaning or effect of the language used in the bill as understood by the person or persons making such statements. The reason for this is that it is impossible to determine with certainty what construction was put upon an act by the members of the legislative body that passed it by resorting to the speeches of individual members thereof. Those who did not speak may not have agreed with those who did; and those who spoke might differ from each other." (quoting 25 R. C. L. 1037, 1038)).

Even more misleading would be to rely on what legislators did not say and extrapolate from that silence certain meaning. As may be obvious, "Legislative silence is a poor beacon to follow in discerning the proper statutory route." *Zuber v. Allen*, 396 U.S. 168, 185 (1969). The majority, relying on *Kennedy*, concludes that here persuasive proof of legislative intent "'is the lack of legislative history and debate' on what would surely have been such a controversial legislative act." *Kennedy*, 345 S.C. at 348, 549 S.E.2d at 247. The mistaken rationale *Kennedy* leaves us with is that the Legislature does not pass significant legislation unless some significant legislative history surrounds it. I understand the majority's focus on the legislative debate and comments about the significant and controversial statute before us, bookended as it is by decisions of this Court. But, in future cases, we should resist the temptation to interpret statutes based on some kind of canon of

legislative silence, as if the legislature's silence is a form of negative space from which meaning can be derived. The legislative history of statutes in our State is often sparse. It can be folly to conclude the legislature "cannot be credited with having achieved anything of major importance by simply saying it, in ordinary language, in the text of a statute, 'without comment' in the legislative history." *Chisom v. Roemer*, 501 U.S. 380, 406 (1991) (Scalia, J., dissenting); *see also Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 592 (1980) ("In ascertaining the meaning of a statute, a court cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark."). As Justice Scalia concluded: "We are here to apply the statute, not legislative history, and certainly not the absence of legislative history. Statutes are the law though sleeping dogs lie." *Chisom*, 501 U.S. at 406 (Scalia, J., dissenting).

The statutory construction question before us may be resolved by looking at the language of the 2023 Fetal Heartbeat Act (including the express legislative findings) as well as the language of the Woman's Right to Know Act—which is incorporated into the 2023 Fetal Heartbeat Act by reference. *See* S.C. Code Ann. § 44-41-630(B) (Supp. 2024) (prohibiting a person from performing an abortion "if the unborn child's fetal heartbeat has been detected in accordance with Section 44-41-330(A) [(Supp 2024) of the Woman's Right to Know Act]"). To the extent there is any uncertainty of the meaning of the terms of the 2023 Fetal Heartbeat Act used by the Legislature, it may be reconciled by reading the two acts in tandem, in light of the Legislature's overarching objectives of "protecting the health of the woman and the life of the unborn child." Act No. 70, 2023 S.C. Acts § 1(3); *see CFRE, LLC v. Greenville Cnty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011) (stating that, when construing language in a statute, "'the statute must be read as a whole and sections which are part of the same general statutory law must be construed together and each one given effect'" (quoting *S.C. State Ports Auth. v. Jasper County*, 368 S.C. 388, 398, 629 S.E.2d 624, 629 (2006)); *id.* ("[W]e read the statute as a whole and in a manner consonant and in harmony with its purpose."); *Joiner ex rel. Rivas v. Rivas*, 342 S.C. 102, 109, 536 S.E.2d 372, 375 (2000) ("It is well settled that statutes dealing with the same subject matter are *in pari materia* and must be construed together, if possible, to produce a single, harmonious result.").

In *Planned Parenthood II*, this Court found the 2023 Fetal Heartbeat Act "generally prohibits an abortion after the detection of a fetal heartbeat, not at a specified period of weeks into the pregnancy." *Planned Parenthood S. Atl.*, 440 S.C. at 474, 892 S.E.2d at 126. In the 2023 Fetal Heartbeat Act, "fetal heartbeat" is defined as "cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac." S.C. Code Ann. § 44-41-610(6) (Supp. 2024).

"Gestational sac" is defined as "the structure that comprises the extraembryonic membranes that envelop the unborn child and that is typically visible by ultrasound after the fourth week of pregnancy." S.C. Code Ann. § 44-41-610(7) (Supp. 2024).

These terms are expounded upon in legislative findings of Section 1 of the 2023 Fetal Heartbeat Act, which states:

> (1) A fetal heartbeat is a key medical predictor that an unborn child will reach live birth.
> (2) Cardiac activity begins at a biologically identifiable moment in time, normally when the fetal heart is formed in the gestational sac.
> (3) The State of South Carolina has a compelling interest from the outset of a woman's pregnancy in protecting the health of the woman and the life of the unborn child.

Act No. 70, 2023 S.C. Acts § 1. According to the 2023 Fetal Heartbeat Act, except in a medical emergency, a healthcare provider who is treating a pregnant woman seeking an abortion must, in addition to other requirements and disclosures, "perform an obstetric ultrasound on the pregnant woman" and display for the woman her "unborn child's fetal heartbeat, if present and viewable." S.C. Code Ann. § 44-41-630(A)(1), (2), and (3) (Supp. 2024); *see also* § 44-41-330(A)(1)(a)(iii) and (b) (describing requirements for this ultrasound under the Woman's Right to Know Act). This heartbeat, which is viewable by ultrasound, generates a sound through the ultrasound, and the pregnant woman has a right to "hear the unborn child's fetal heartbeat, if present." § 44-41-330 (A)(1)(b). When the heartbeat is "detectable" by the treating doctor, the doctor, among other things, is both: 1) required to present the pregnant woman with "the statistical probability, absent an induced abortion, of bringing the human fetus possessing a detectable fetal heartbeat to term based on the gestational age of the human fetus" and 2) prohibited from "perform[ing] or induc[ing] an abortion." § 44-41-330(A)(1)(e); § 44-41-630(B).

Therefore, reading the whole act together, the fetal heartbeat, a key medical predictor that an unborn child will reach live birth, is synonymous with cardiac activity, detectable by ultrasound, which begins in each pregnancy at a biologically identifiable moment in time, although the precise moment may vary in each pregnancy.

I therefore read the 2023 Fetal Heartbeat Act as prohibiting abortions when cardiac activity is detected by the statutorily required ultrasound, meaning the activity can be seen on the ultrasound, as well as heard through the ultrasound. I find the Legislature intended to prohibit abortions of unborn children when they have cardiac activity from the earliest moment cardiac activity is "detectable"—visibly and audibly—by ultrasound. This interpretation is consistent with the 2023 Fetal Heartbeat Act's key express legislative findings that focus on the connection between the fetal heartbeat and the chances of a live birth, a correlation the majority well discusses at length.

With these clarifications, I concur with the majority.